UNITED STATES of America, Plaintiff-Appellee,

v.

William R. LICHOTA, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Edith F. LICHOTA, Defendant-Appellant.

Nos. 16176, 16177.

United States Court of Appeals Sixth Circuit.

Sept. 30, 1965.

Edith F. Lichota, Toledo, Ohio, Sumner Canary, Arter, Hadden, Wykoff & Vanduzer, Cleveland, Ohio, on brief, for appellants.

Harry E. Pickering, Asst. U. S. Atty., Cleveland, Ohio, Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on brief, for appellee.

Before CECIL,* O'SULLIVAN and PHILLIPS, Circuit Judges.

HARRY PHILLIPS, Circuit Judge.

Defendants-appellants are husband and wife and both are licensed attorneys of the Ohio bar, having resided at Twinsburg, Ohio, during the period involved in this case. They were indicted on three substantive counts of mail fraud in violation of 18 U.S.C. § 1341 [1] and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. The jury returned a verdict of guilty as to both defendants on all four counts. The district judge suspended sentence and ordered probation for one year. Both defendants have appealed.

It is urged on behalf of defendants that the district court should have granted their motion for a directed verdict of acquittal at the close of all the evidence. The principal question presented on this appeal is whether there is substantial competent evidence in the record

* Honorable Lester L. Cecil became Senior Circuit Judge on August 1, 1965, and has since been sitting on the Court by assignment.

1. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

to support the verdict of the jury. The disposition of this question requires that we make a somewhat detailed summary of the evidence.

In 1957 William Lichota was employed by Pure Milk Association, hereinafter referred to as PMA, of Chicago, Illinois, to do legal work on a full-time salaried basis. His title was director of special services.

PMA is an agricultural cooperative association of about 12,000 dairy farmers who live within a radius of 150 miles of Chicago. It is engaged in the business of receiving, processing and marketing milk produced by its member dairies.

The record shows that through the use of fictitious names of individuals, companies and firms, of which the defendants were a part, they contracted printing work for PMA and issued false invoices to the association which Mr. Lichota authorized to be paid. The defendants were the recipients of gain on these false invoices.

During the time of Mr. Lichota's employment, PMA acquired two additional dairy cooperatives which became divisions of the association. To effectuate this expansion, PMA determined that it would issue loan certificates, a type of debenture, which would be exchanged with farmers owning stock in the acquired cooperatives and which would be sold to PMA members and employees to obtain operating capital.

Mr. Lichota was secretary of the planning committee of the board of directors of PMA and was placed in charge of the loan certificate program. His position was one of responsibility and trust. During the course of this loan certificate program he became aware of the necessity for considerable amounts of printed materials. In December 1958, he told the general manager of PMA that he, Lichota, could get a better price for the printing of the loan certificates from a company located in the Cleveland area, with which he was acquainted.

The responsibility for the printing of loan certificates and the receiving and accounting for them was then placed in the hands of Mr. Lichota. Additionally, in his position as director of the loan certificate program, he would suggest the printing of brochures and other promotional materials and represented that he could get them printed more cheaply in Cleveland. Approved materials would then be turned over to Mr. Lichota to arrange for the printing, rather than having the printing contracted for directly through PMA's purchasing department.

Contemporaneously with Mr. Lichota's representations to PMA concerning his knowledge of lower printing prices in Cleveland, Mrs. Lichota rented a post office box at Bedford, Ohio, nine miles from the residence of defendants. This box was rented in the name of "Artlines of Bedford." Mrs. Lichota presented signature cards to the postal clerk showing that Lucille Beznoska, Mr. Lichota's mother, and "Lawrence Bradford" were authorized to receive mail. Mrs. Lichota admitted that she used the fictitious name, "Lawrence Bradford," with the explanation that a masculine name was chosen because people were more likely to deal with a man. Mrs. Lichota also admitted the use of the name "Miss Gordan" in connection with the business purportedly as secretary, explaining that this was done for the purpose of giving the business some additional prestige. Evidence also was introduced that office space was rented for the business for the same reason.

During the period from June 1959 and through February 1960, at least twenty-four separate orders were placed by PMA with Artlines. Artlines had no printing equipment but subcontracted with the Lincoln Press in Bedford, Ohio, to do all printing work. The owner of the Lincoln Press testified that one or both of the Lichotas placed the orders and picked up the printed materials and that he knew them only as "Bradfords." Mr. Lichota denied that he ever used the name "Bradford."

In January 1959, a bank account was opened at a branch of the Cleveland Trust

Company under the name "Artlines of Bedford." The names of Lawrence Bradford and Lucille Bradford were listed on signature cards as being authorized to draw checks. Mr. Lichota testified that his mother used the name Lucille Bradford because of the difficulty of the name Lucille Beznoska. The mother did not testify.

When the Lichotas received the printing from Lincoln Press, they would prepare invoices in the name of Artlines and submit them to PMA. It is uncontradicted that the quantities of printed materials delivered were overstated on the invoices and the prices charged to PMA were substantially higher than the charges made to Artlines by Lincoln Press.

Mr. Lichota admitted that he never disclosed to anyone at PMA that he and his wife were associated with Artlines or that the principal customer of Artlines was PMA. The only other customers of Artlines disclosed by the evidence were three other enterprises created and controlled by defendants under the names of Hellman and Connors, Midwest Office Service Company and Elton Investment Company, to which further reference will be made hereafter in this opinion. PMA's general manager testified that he was never told of the relationship and that he was not aware that Artlines was created or operated by the Lichotas. Mr. Lichota undertook to justify his failure to disclose his relationship by explaining that he was "not asked."

The defendants entered into evidence an unverified photostatic copy of a purported executed power of attorney contract [2] between PMA and W. R. Lichota which undertook to confer certain powers as set forth in the instrument.

Defendants strongly rely upon this power of attorney for the various actions taken by them on behalf of PMA.

2. "Know all Men by these Presents that Pure Milk Association, 343 South Dearborn Street of the City of Chicago County of Cook in the State of Illinois has made, constituted and appointed, and BY THESE PRESENTS does make, constitute and appoint W. R. Lichota of the City of Chicago County of Cook and State of Illinois true and lawful ATTORNEY for it and in its name, place and stead to further engage Artlines of Bedford to develop a complete sales promotion program for Loan Certificates, including all prospectuses, mailouts, brochures and Loan Certificate forms. Artlines to furnish all advertising copy, photographic work, art design, layout, the special cartoon program, paper stock, and shipping to Chicago. E. F. Lichota to have use of our Chicago office and access to all our plants, but will do no work for our competitors and surrenders all ownership, copyright and trademark rights in any material furnished. W. R. Lichota given full discretionary authority to amend the size of the program, quantity, or quality of program based on size of budget plus supplementary appropriations. Elton Trust to control L. C. price levels, secure outside office services and to pay to undersigned ⅔ of net profits on security transactions, giving and granting unto the said ATTORNEY full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as it might or could do if personally present at the doing thereof, with full power of substitution and revocation, hereby ratifying and confirming all that the said ATTORNEY or Agent substitute shall lawfully do or cause to be done by virtue hereof.

"In Testimony Whereof, we have hereunto set our hand and seal this ———— day of May, 1959.

"Signed, Sealed and Delivered in Presence of /s/ Timothy Morgan, /s/ A. L. McWilliams, /s/ Avery A. Vose, President, /s/ Chester W. Bolcum, Jr., Secretary.

"State of Illinois, County of Cook, ss

"I, Vivien A. Cox, Notary Public in and for, and residing in the said County, in the State aforesaid, DO HEREBY CERTIFY, that Avery Vose, President and Chester W. Bolcum, Jr., Secy-Trea. personally known to me to be the same persons whose names subscribed to the foregoing Instrument appeared before me this day in person and acknowledged that they signed, sealed and delivered the said Instrument as their free and voluntary act, for the uses and purposes therein set forth.

"Given under my hand and notarial seal, this Eleventh day of May, A.D. 1959.

"/s/ Vivien A. Cox, Notary Public, "My Commission Expires September 30, 196?."

Three of the persons whose names appear on the power of attorney, PMA president, Avery Vose, witness Timothy Morgan and Notary Public Vivien A. Cox, were not called to testify concerning this document. Chester W. Bolcum, Jr., whose name appears as a signer of the document in his capacity as PMA secretary-treasurer, testified that he did not remember ever seeing or signing the document, although he believed this to be his signature and he believed it to be the signature of Avery Vose. He further stated that he had met Mrs. Lichota once or twice at annual meetings of PMA and that he did not know if she ever did any work for PMA. A. L. McWilliams, general manager of PMA, whose name appears as a witness to the power of attorney, denied ever meeting or hearing of Mrs. Lichota or of having seen or signed this document. He did testify, however, that it appeared to be his signature and that he believed the document had been executed since the names appeared thereon. The Secretary of the PMA Board of Directors, who was the person charged with keeping company records, was unable to produce the original or a copy of the document.

The validity of this purported power of attorney contract was questioned during the trial, but no satisfactory explanation appears in the record as to the failure of defendants to produce the original of the instrument, rather than a copy, or as to the failure to produce as a witness the notary public who is shown to have notarized the instrument.

The printed materials and invoices described above were delivered to Mr. Lichota in his capacity as an employee of PMA. In each case Mr. Lichota approved the invoices for payment by writing thereon the words, "Please pay, W. R. Lichota."

The proof further discloses other related dealings involving defendants and PMA. Mr. Lichota admitted that he or Mrs. Lichota conceived the idea of representing to PMA the existence of a law firm by the name of Hellman and Connors; that there were no such persons as Hellman or Connors and no law firm by that name; that he brought the name of this fictitious firm to the attention of PMA for the purpose of enabling Hellman and Connors to handle the development of trademarks which were coincident to the printing program that was being taken on by Artlines; and that he approved payments of three or four thousand dollars to the firm. In defense of these acts, Mr. Lichota contended that disclosure as to the identity of the fictitious law firm was made on "the first trademark." [3]

Mr. Bolcum stated that he did not remember signing the document quoted in the third footnote, or ever having seen it; that he did not know whether or not anybody by the name of Hellman and Connors existed; that he had never seen them, nor could he recall having any business dealings with them; and that in fact he did not understand the document.

3. Apparently the registration set forth below is what is meant by this testimony.
"U. S. Department of Commerce
"United States Patent Office
"January 2, 1963
"THIS IS TO CERTIFY that the annexed is a true copy from the records of this office of the Power of Attorney, forming part of the Trademark Application filed April 24, 1959, by the Pure Milk Association, Serial Number 72,230, for Marketing and Distribution of Milk, Milk Products, and Dairy Products.
"By the authority of the COMMISSIONER OF PATENTS
"/s/ W. G. Lanham, Jr., Certifying Officer".

Attached thereto is the following letter:
"TO THE COMMISSIONER OF PATENTS:
"Please recognize the firm of Hellman and Connors, a firm composed solely of Edith F. Lichota, a member of the Bar of the State of Ohio, with offices at Box 57, Solon, Ohio, to prosecute this application, to transact all business in connection therewith, and to receive the certificate.
"/s/ C. W. Bolcum, Jr., For the Pure Milk Association,
343 South Dearborn Street, Chicago 4, Illinois"

Mr. Lichota further stated that two offices were operated under the name of Midwest Office Service Company, one by his mother at her home, and the second by "a man who I represented," operating from a hotel room in Chicago; that the purpose of both of these enterprises was to render office, typing, stenographic and clerical services; that PMA work was channeled to these businesses; that he possibly approved fees to be paid by PMA to Midwest Office Service Company in Chicago for something like $4,000 but the only thing he received was a legal fee of $125 for organizing the Chicago company; that his mother received part of the proceeds paid by PMA to Midwest in Chicago; and that his relationship with Midwest was disclosed under the power of attorney contract. It is to be noted that Midwest is not mentioned in the power of attorney document (footnote 2).

Still another Lichota family enterprise created for the purpose of dealing with PMA was known as Elton Investment Company. In its effort to sell loan certificates, PMA at one time gave consideration to a plan to place in the hands of Mr. Lichota the sum of $25,000 and to set him up as broker so as to provide a "secondary market" for loan certificates. After this proposal had been discarded, Mr. Lichota formed Elton Investment Company in order to provide the needed "secondary market." This "investment company" is represented to have been owned by Mr. Lichota's mother, who, as heretofore stated, did not testify as a witness. The address of Elton was given at a post office box at Solon, Ohio. Defendants acted on behalf of Elton at the same time that Mr. Lichota was serving as a full-time paid employee of PMA. As with Artlines, Midwest and Hellman and Connors, Mr. Lichota never disclosed to PMA his family relationship with Elton or the true identity of the ownership of this "investment company."

PMA adopted a proposal designating Elton Investment Company as exclusive agent to buy loan certificates at fifty per cent of face value. Elton purchased a substantial number of these certificates. A notice was mailed to the stockholders of one of the cooperatives stating that Elton would buy their certificates.

There was introduced in evidence a letter from Elton to PMA signed by one "R. S. Mather," also a fictitious name. This letter apparently was written by one of the defendants.[4]

4. "ELTON INVESTMENT COMPANY
'Solon's Largest Investment Service'
Box 96
Solon, Ohio
February 13, 1961
"The Pure Milk Association
343 South Dearborn Street
Chicago 4, Illinois
"Gentlemen:
"On Saturday, February 11, we had dinner with your Mr. Lichota. We were advised that, at least for the present, you would no longer refer holders of Loan Certificates, and/or stock convertible to Loan Certificates, to us when such holders were desirous of selling their certificates. We have not yet conferred with our attorneys. Nor have we discussed the matter with our senior investment officer because he is momentarily in Florida. But we have concluded that this decision represents a major policy departure by the Pure Milk Association for the reason that we were under the impression that the Pure Milk Association was actively seeking a market for the sale of its Loan Certificates. In reliance upon your request for the purchase of your Loan Certificates, we have authorized brokerage companies and attorneys to purchase Loan Certificates, and/or stock convertible to Loan Certificates, at prices announced to you in our letter of January 10, 1961. In pursuance of that January 10 letter, we have already expended some $1,100.00 for printing of forms, postage and stamped envelopes, envelope stuffing and addressing. Commitments on our behalf have already been made, and, in fact, we have paid for stock and Loan Certificates as of this date. It now becomes exceedingly impractical for us to shift again at your whim, for we feel that, in many instances, we are legally bound, and unquestionably, morally bound, to honor our agreements.
"We think this is a tardy time for the Pure Milk Association to make so radical a policy departure which affects our agreements. We would not try to compel

Subsequently, after finding that Mr. Lichota was spearheading a proxy fight to gain control of the Association, PMA dismissed him. An investigator was

your cooperation, but we shall make a thorough reappraisal of your situation. We have held investments in the Pure Milk Association, and in the stock of companies acquired by the Pure Milk Association, since early in 1958, and we have at no time attempted to influence or control the policies of the Association. In all this period, we have never received a single financial statement with regard to the operations of the Association. You are, of course, aware that the corporate law in the State of Illinois does not relieve a corporation from the duty of furnishing periodic financial reports to its investors. We expect that you will furnish to us appropriate financial reports directly.

"In the past we have availed ourselves of various private credit reports. While these reports have been meager, they have raised a number of points for consideration, the most significant of which was the right of the Association to create a senior secured debt, secured by mortgage, with the St. Paul Bank For Co-operatives, without the consent of the Loan Certificate holders who are presently creditors of the Association. Our attorneys advise us that this is especially true of the E and I series which have a preferred status as a result of the Dairy-land merger.

"The radical departure of the Pure Milk Association from the area of powdered milk manufacture to the field of milk distribution is certainly a marked digression from the original corporate purposes, and the further question has arisen as to whether or not this can be done legally without the consent of the Loan Certificate holders.

"The continued financial reverses which have been characteristic of your operations, and which have resulted in the loss of your Dun and Bradstreet rating have been of no small concern to us.

"Periodically, we have met with your Mr. Lichota, both in Chicago at your office, and in Cleveland, and we have been reasonably well satisfied with his explanations of your operations and management endeavors. Because of the fact that we know Mr. Lichota and respect both his integrity and judgment, we have not asked for many of the certified documents and other data to which we are entitled as investors. Rest assured, however, that now we shall move to protect our rights fully. As we understand it, Mr. Lichota was authorized by your Board of Direc-

tors to 'find a market for Loan Certificates,' so that this change of policy which has just been communicated to us is one dictated by the management and contrary to the expressed policy of the Board of Directors. We have relied upon Mr. Lichota's authorization from the Board. Some of our associates, who though not connected with us have met your Mr. C. W. Bolcum, agree with us that he is an individual worthy of our confidence in his integrity and competence. The failure of management to act in accordance with the stated will of your Board of Directors, is to us, cause for grave concern. This concern is heightened by the failure of your management to furnish us with the proper financial statements. The loss of your top rating with Dun and Bradstreet would seem to indicate that this concern is shared by others.

"As an investment trust, we do not shift our investments indiscriminately, and, frankly, our investment committee is largely in Florida at the present time. Consequently, without compelling reasons for doing so, we are reluctant to make a change in our position or policy at this time. For tax reasons, we are disinclined to convert stock we hold into Loan Certificates merely to become holders of record, and we consider this to be within our legal rights.

"I am not able to understand why a problem exists between us and the Pure Milk Association. A short time ago, your Pure Milk Association authorized us to buy for them, Loan Certificates at the rate of $.50 on the $1.00 of principal amount. We have offered $.80 on the $1.00 for the particular series for which you offered $.50. Is it not the policy of the Association to obtain for its Loan Certificate holders the best price available for their holdings? Or is it your policy to discourage investors and thus artificially depress prices so that some insiders can make bargain purchases? If this latter applies, you are responsible for creating an extremely unhealthy and suspect market. You realize that such a situation is contrary to the Illinois Cooperative Act, and particularly in violation of the Securities Laws of the State of Illinois. In fact, the purposeful conduct with this end in view will create a personal liability upon the directors and officers of your corporation. If this situation exists, we will move immediately to suspend all further purchases, dispose

hired to conduct an inquiry of Mr. Lichota and the relationships hereinabove described then came to light.

Evidence was introduced to the effect that 500 loan certificates were missing. The investigator testified that Mr. Lichota told him that he had 500 unused PMA loan certificates in his possession which he was keeping as "his ace in the hole" in negotiating with PMA. Mr. Lichota admitted making such representations to the investigator, but denied that he actually had the certificates, saying that he was using this as a "bargaining point."

When questioned by the investigator, Mr. Lichota at first denied that he had ever been at Artlines of Bedford or that he knew the identity of Lawrence Bradford.

The four counts of the indictment on which defendants were convicted are summarized in the margin.[5]

■ Without lengthening this opinion with further details, suffice it to say that we find substantial evidence in the record supporting the jury's verdict of guilty on these four counts of the indictment.

The defense was based primarily upon good faith and lack of intent to defraud. Defendants contended in the district court and maintain in this court that the overcharges described in the indictments represented nothing more than reasonable compensation for services rendered

of our holdings, and take such remedial action as our attorneys might advise.

"Certainly our motives have always been above reproach, and our conduct will bear any kind of scrutiny that you care to give it. It is true that we are making investments in other cooperatives in your area of operations, and no action by the Pure Milk Association will dissuade us as this activity is wholly unrelated to your enterprise. It is contemplated that we shall be in the milk business, indirectly, in a substantial fashion with.or without the approval of the Pure Milk Association. In some instances, we undoubtedly shall be financing competitors of yours.

"In conclusion, we view your alarm as being unfounded unless there is something on your part which has been hidden from view and will not bear examination. It must be obvious to you, as it is to us, that someone is making a mountain out of a molehill. Without compelling cause, we certainly do not contemplate any legal action against the association, as we are satisfied with Mr. Lichota's explanations. If, however, you or your organization are determined to go to court about something, we will make no attempt to discourage you. Be advised that upon receipt of your notification of intent to do so, we will furnish to you, by return mail, the name of our agent for the service of process, and his address. We are disinclined to embark upon, or entertain, legal actions without very good cause. But if you have, in your estimation, such cause, by all means pursue it, as we will see the proceedings to a final conclusion and make a thorough investigation of your affairs in so doing. I am authorized to advise you that we shall engage you in any legal action *which you initiate*, and we shall carry our fight, if necessary, to the membership itself. If you wish to make a proposal of contest at your annual meeting, please advise us directly so that we can arrange for counsel at that time.

"As we see it, the initiative is yours.
"Very truly yours,
Elton Investment Company
By R. S. Mather
cc: A. M. McWilliams
C. W. Bolcum
W. R. Lichota"

5. Count one charged that on November 5, 1959, 6,000 F Series loan certificates and 6,000 J Series loan certificates were printed by the Lincoln Press for Artlines at a total cost of $892.00. The invoice submitted by Artlines to PMA charged for 10,000 Series F certificates at the rate of $1,545.80. A check for this amount was issued by the Dairyland Division of PMA at Juneau, Wisconsin, and mailed to Artlines.

Count two involves payment for 10,000 J Series loan certificates referred to in count one. The invoice submitted to PMA was for 10,000 Series J certificates and priced at $1080.00. The check was also placed in the mails to Artlines.

Count three involved 10,000 loan certificates printed by Lincoln Press at the cost of $789.00 and billed to PMA in the amount of $2,166.00 for 16,500 certificates. Payment was made by mail.

The final count charged conspiracy to commit the offenses enumerated in the first three counts.

in the form of art work and legal work and principally compensation for the valuable services of Mrs. Lichota. It is asserted that defendants had no intent to defraud PMA; that their services were performed in utmost good faith; that Artlines of Bedford was a legitimate enterprise which rendered valuable services in return for all money paid to it; and that PMA could not have obtained these services at such a reasonable price elsewhere because of Mrs. Lichota's combined ability as a lawyer and skill as a commercial artist.

It is contended that the evidence is insufficient to support a finding by the jury of the requisite intent required to establish mail fraud, and that in any event nothing more is established than constructive fraud, which is insufficient to support a conviction.

In Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, the Court stated:

"The elements of the offense of mail fraud under 18 U.S.C. (Supp. V) § 1341, 18 U.S.C.A. 1341, are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."

In United States v. Sorce, 308 F.2d 299, 300–301 (C.A.4), cert. denied, 377 U.S. 957, 84 S.Ct. 1635, 12 L.Ed.2d 500, the Court said:

"In order to support a conviction under the mail fraud statute, 18 U.S. C.A. § 1341, it is not necessary that the false representations were themselves transmitted by mail, nor that the defendant personally received the mail from his victim. It is sufficient that the use of the mails was caused by the defendant in furtherance of his fraudulent scheme."

The Court in Beck v. United States, 305 F.2d 595, 598, cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123, said:

"In this case there were two essential elements of proof for the government to meet in making a submissible case, (1) the existence of a scheme or artifice to defraud or for the obtaining of money by means of false pretenses, representations or promises, and (2) the use of the United States mails in furtherance of such scheme or artifice. * * * Such proof may be made by either direct or circumstantial evidence."

Proof of a scheme to defraud involves the establishment of the element of intent. In Silverman v. United States, 213 F.2d 405, 407 (C.A.5), cert. denied, 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653, the Court said: "[T]he law is well settled that, if a scheme is devised with the *intent* to defraud * * *." (emphasis added); and in Beck v. United States, supra, 305 F.2d 595, 599, (C.A.10), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123, the Court said: "[*I*]*ntent to defraud* the purchasers of the knitting machines was an essential element." (emphasis added)  This Court in United States v. Rabinowitz, 327 F.2d 62, 76–77 (C.A.6) said:

"In every mail fraud case, there must be a scheme to defraud, representations known by defendants to be false and some person or persons must have been defrauded. * * * The scheme to defraud *must have included the intent* to do so. Even if the statements complained of were false, defendants *must have known* them to be false and they *must have intended to defraud* in order to be found guilty." (Emphasis added.)

It is equally well settled that questions of intent and good faith are for the jury. In Silverman v. United States, supra, 213 F.2d 405, 407, cert. denied 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653, the Court said:

"Whether the acts of appellant showed beyond every reasonable doubt a scheme and intent to defraud as charged in the indictment was a question for the jury; and we think that we would not be justified in disturbing the verdict of the jury."

In Stone v. United States, 113 F.2d 70, 74–75 (C.A.6), this Court stated:

"Of course, in every agreement like these charged, there must be an in-

tent on the part of the person who attempts or performs it, to do that which is unlawful. A question of intent usually resolves itself into one of fact. We arrive at one's intention by taking hold of certain circumstances, extraneous though they may be, and reasoning out the purpose in doing the act. It is a mental process, but a *man's intention is really a question of fact to be arrived at by the trier of the facts* in the exercise of reasonable discretion, after considering all the circumstances connected with the act charged." (Emphasis added.)

In Henderson v. United States, 202 F.2d 400, 403 (C.A.6), this Court said:

"Direct proof of willful intent is not necessary. It may be inferred from the acts of the parties, and such inference may arise from a combination of the acts, although each act standing by itself may seem unimportant. It is a question of fact to be determined by the jury from all the circumstances. Battjes v. United States, 6 Cir., 172 F.2d 1, 5."

See also Henderson v. United States, 218 F.2d 14, 50 A.L.R.2d 754 (C.A.6), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, rehearing denied, 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290; Coleman v. United States, 167 F.2d 837, 839 (C.A.5).

■ In considering the issue as to the sufficiency of evidence, we are required to view the evidence as well as the inferences properly deducible therefrom in the most favorable light to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Salter, 346 F.2d 509, (C.A.6); United States v. Decker, 304 F.2d 702, 705 (C.A.6).

■ As in all criminal cases, guilt beyond a reasonable doubt must be established. In the present case, from the facts as above set out, we hold that there was evidence sufficient for a jury to determine that the defendants had the requisite intent to defraud PMA and were guilty beyond a reasonable doubt. We are unable to say, tested under the above stated well-established principles, that the issues were improperly submitted to the jury or that the jury did not return a permissible verdict. To the contrary, we find that there was substantial evidence supporting the verdict.

It is further contended that if any fraud is established by the evidence, it was nothing more than constructive fraud and that the conviction must be reversed under the holding of this Court in Epstein v. United States, 174 F.2d 754, 765–66 (C.A.6), in which we said:

"Courts speak of actual or active fraud as contrasted with constructive fraud. Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud. (Citations omitted.) To constitute actual fraud, there must be such a fraud as affects the conscience. (Citation omitted.) Constructive fraud is a breach of legal or equitable duty which, in spite of the fact that there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injury public interests. (Citations omitted.) Constructive fraud may be found merely from the relation of the parties to a transaction or from circumstances and surroundings under which it takes place. (Citation omitted.) It is said that constructive fraud is a term that means, essentially, nothing more than the receipt and retention of unmerited benefits. (Citation omitted.)"

In Cacy v. United States, 298 F.2d 227, 229 (C.A.9), the Court held that: "Deceitful concealment of material facts is not constructive fraud but actual fraud."

In Henderson v. United States, supra, 202 F.2d 400, 404–405 (C.A.6), we said:

"A scheme to defraud, within the meaning of the statute, may exist although no misrepresentation of fact is made.

\* \* \* \* \* \*

"In order to come within the terms of the statute, it is not necessary that the victim be deceived. The offense is committed when the scheme has been devised, and in pursuance of it the mail has been used."

In Linden v. United States, 254 F.2d 560 (C.A.4), the Court said:

"The known misleading tendency of of a scheme is indicative of the defendants' criminal intent, and the trier of the facts may reasonably in such circumstances apply the presumption, founded upon common experience and recognized in law, that a person intends the consequences of his acts." 254 F.2d at 566.

\* \* \* \* \* \*

"Deception is not necessarily confined to a direct statement of fact. Not words alone but their arrangement, and the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive, even though the words themselves fall short of this. Sometimes circumstances are more eloquent than words, and they impart their meaning to the words used. 7 Wigmore, Evidence (1940), Sec. 1969, p. 109; Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, 407." 254 F.2d at 568.

▮ We find that the evidence hereinabove summarized supports the holding of the jury that defendants were guilty of actual fraud, as distinguished from constructive fraud, and that Epstein v. United States, supra, is distinguishable on its facts from the present case.

▮ It is contended that the district court committed reversible error in his charge to the jury. No objection was made to the charge as given. Failure to object to the charge precludes the raising of this question on appeal. United States v. Salter, supra, 346 F.2d 509 (C.A.6); United States v. Decker, 304 F.2d 702, 705 (C.A.6); Rule 30, Fed.R. Crim.P.

▮ Complaint also is asserted as to the argument of the district attorney to the jury. No objection was expressed to any part of this argument at the time it was made. We have read the entire argument and find no plain error within the contemplation of Rule 52(b), Fed.R. Crim.P. or the holding of this court in United States v. Graham, 325 F.2d 922 (C.A.6). See Annotation, 50 A.L.R.2d 766.

Numerous other errors are charged, including the admissibility of evidence, an alleged fatal variance between the indictment and the bill of particulars and the evidence, and failure of the district court to direct a verdict of acquittal. All of these contentions have been considered and are found to be without merit.

The judgment of the district court is affirmed.