UNITED STATES of America,
Plaintiff-Appellee,

v.

John ANDREADIS a/k/a John Andre
and Drug Research Corporation,
Defendants-Appellants.

No. 277, Docket 29912.

United States Court of Appeals
Second Circuit.

Argued March 23, 1966.

Decided Sept. 1, 1966.

See also D.C., 238 F.Supp. 800;
D.C., 238 F.Supp. 805.

Joseph P. Hoey, U. S. Attorney, E. D. N. Y.; Jonathan L. Goldstein, Attorney, U. S. Dept. of Justice; Jerome C. Ditore, Asst. U. S. Attorney, for plaintiff-appellee.

Maurice Edelbaum, New York City, for defendants-appellants.

Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

Appellants, John Andreadis, a/k/a John Andre, and Drug Research Corporation, a company that Andre controlled, appeal from judgments of conviction entered after a jury trial before Judge Bartels in the United States District Court for the Eastern District of New York. Appellants were indicted, tried, and convicted on forty-two counts of knowingly using either the United States mails or radio and television communication in interstate commerce, in furtherance of an intentional scheme to defraud prospective purchasers of the product "Regimen Tablets" by false or fraudulent pretenses, representations and promises in violation of 18 U.S.C. §§ 1341 (mail fraud) [1] and 1343 (wire fraud); [2] on one count of conspiring to violate the federal statutes just cited in violation of 18 U.S.C. § 371; and on one count of causing to be introduced and delivered in interstate commerce, with intent to defraud and mislead, a quantity of cartons of a product labeled "Regimen Tablets," together with a display kit, which contained statements that were false and misleading in violation of 21 U.S.C. §§ 331(a), 333(b) and 18 U.S.C. § 2. We find no error and affirm the judgments on all counts.

"Regimen Tablets," manufactured for, and sold by, appellants, consisted of supplies of three pills, a green pill containing 22.5 mg. of benzocaine plus vitamins and minerals that was supposed to deaden the tongue and sense of taste; a pink pill containing 648 mg. of ammonium chloride and various vitamins that was supposed to act as a diuretic; and a yellow pill containing 75 mg. of phenyl-propanolamine (PPA) that was supposed to act as an appetite depressant. Boxes of "Regimen Tablets" were sold, without prescription, over-the-counter, in two sizes; a $3 box containing 78 tablets, a so-called 10 day supply; and a $5 box containing 156 tablets, a so-called 20 day supply.

1. This section provides in relevant part as follows:

Whoever, having devised * * * any scheme or artifice to defraud * * * by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice * * * places in any post office * * * any matter or thing whatever to be sent or delivered by the Post Office Department * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. This section provides in relevant part as follows:

Whoever, having devised * * * any scheme or artifice to defraud * * * by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be fined not more than $1,000 or imprisoned not more than five years, or both.

For a period of years between the mid-1950's and 1962, when the Federal Drug Administration finally removed "Regimen Tablets" from the market, appellants devised and executed a scheme to merchandise this product as a miracle weight-reducing drug. At the start Drug Research Corporation, controlled by Andre, who was also its President,[3] used mail order advertising to sell "Regimen Tablets." The advertising material mailed to the public claimed that "Regimen Tablets" was a new "wonder drug for fat people" that made possible "no diet reducing" and that without dieting, special eating, or giving up "the kinds of food you like to eat" the pills would cause "your body to lost weight the fastest acting way * * *." In 1957, Andre retained Kastor-Hilton, Chesley, Clifford & Atherton, Inc. (hereinafter Kastor-Hilton), an advertising agency, to develop advertising copy to be placed in various national media.[4] Kastor-Hilton remained Andre's advertising agency for the "Regimen Tablets" account until 1961. During that time reliance on mail order advertising to sell the product was replaced by reliance on more sophisticated advertising techniques. Kastor-Hilton arranged for advertisements to be placed in the newspapers of every major city in the country, in magazines. of national circulation, and on programs televised on all the major networks, which claimed that "Regimen Tablets" made possible "no-diet" reducing, or reducing "without dieting" and that the pills had been "clinically tested" or "proven clinically effective." In certain instances these claims were qualified when a national magazine or television program refused to accept the "Regimen Tablets" copy as first submitted

by Kastor-Hilton, but Andre agreed to such changes grudgingly and he ordered Kastor-Hilton to retain these extravagant claims in the copy submitted to other, less particular, media. Without much doubt, the most successful of the advertising schemes devised by Kastor-Hilton for "Regimen Tablets," and assuredly the most spectacular, involved the use of "endorsers," that is, individuals who for a period of time would appear each week, "live," on a television program, demonstrate their weekly weight loss, which usually was quite substantial,[5] and state *inter alia* that they were losing the weight while eating the foods they normally ate and "without dieting," that, "thanks to Regimen Tablets [they] felt satisfied with a fraction of the calories [they] used to eat * * *," and that they "never felt better."

Each of the counts charging a scheme to defraud by means of false or fraudulent pretenses, on which appellants were convicted, set forth a specific instance in which the United States mails or interstate radio or television communication had been utilized by appellants to disseminate their advertising claims that "Regimen Tablets," taken as directed, would cause a person of normal health to lose weight "without dieting," or that this product made possible "no-diet reducing" and that it had been "clinically tested" or "proven clinically effective." The thrust of the Government's case was that there was here an intent to defraud because these representations and statements were scientifically and factually false, and yet appellants continued to include these representations and statements in their advertisements for "Regimen Tablets."[6] It is the Government's

---

3. In effect Andre *was* Drug Research Corporation and throughout this opinion we will refer to both as Andre.

4. Kastor-Hilton was a codefendant below. It was found guilty of having violated, on several counts, 18 U.S.C. §§ 1341 and 1343, and of having conspired so to do in violation of 18 U.S.C. § 371. It has not appealed its conviction.

5. Endorser Bryce lost 25 pounds in six weeks; Endorser Antonacci lost 12 pounds in fourteen days.

6. On appeal appellants do not argue that the Government failed to make out its case with respect to certain counts in the indictment but not with respect to other counts. Thus it suffices to review the Government's case generally as it relates to all the counts on which appellants were ultimately found guilty.

contention that proof of these facts sufficed to convict appellants under 18 U.S.C. §§ 1341 and 1343 on each of the counts on which they were convicted. This contention will bear some further analysis.[7] But, assuming for present purposes that the Government is correct and that proof of this set of facts warrants the conclusion that 18 U.S.C. §§ 1341 and 1343 were violated, the essential issue before us becomes that of determining whether the Government adduced evidence sufficient to support the jury's determination that this set of facts existed in every instance in which it returned a verdict of guilty.

 At the outset we note that, first, on appeal from a jury conviction we must view the evidence in the light most favorable to the Government, United States v. Press, 336 F.2d 1003, 1009 (2 Cir. 1964), cert. denied, 379 U.S. 965, 973, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965), and second, when the verdict of the jury is attacked for an alleged lack of evidence to support it, the verdict will not be set aside if it is supported by substantial evidence, e. g., United States v. Valenti, 134 F.2d 362 (2 Cir.), cert. denied, 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712 (1943). Within this perimeter of the area of permissible review, we hold that the Government presented evidence sufficiently probative to support its claims that certain representations and statements found in most advertising for "Regimen Tablets" were scientifically and factually false, that appellants knew them to be false, and, despite this falsity and appellants' knowledge thereof, appellants continued to include these representations and statements in their advertising. A brief summary of the evidence tending to support these claims follows.

In order to establish that appellants' advertising claims were scientifically false the Government introduced two expert witnesses, Dr. Jean Mayer and Dr. Arthur Grollman, both of whom were well-qualified to assess the scientific merit of the claims that "Regimen Tab-lets" would cause a person to lose weight "without dieting," and would make possible "no-diet reducing." Taken together, the testimony of Drs. Mayer and Grollman almost conclusively established that a dosage level of PPA double that found in "Regimen Tablets" would not, even when combined with the other ingredients found in "Regimen Tablets," cause a loss of weight unless accompanied by a diet. Dr. Grollman also testified that certain Andre-sponsored clinical tests of the effectiveness of "Regimen Tablets" could not have produced valid scientific results and that the results of these Andre-sponsored clinical tests were flatly contradicted by the Fazekas test, a test of the effectiveness of PPA recognized as authoritative by experts on the problem of obesity.

In order to establish that appellants knew that the claims they made for "Regimen Tablets" were scientifically false the Government introduced evidence tending to prove that several impartial observers had called Andre's attention to the mass of material that cast fundamental doubt on the truthfulness of the claims made for "Regimen Tablets," but that Andre had ignored all requests that he modify his advertising unless he could substantiate his claims and had only diluted his claims when prominent advertising media had refused to run the undiluted claims, and even then had only diluted the copy supplied to the media that objected. For example, it was established that throughout the period of the popularity of "Regimen Tablets" the National Better Business Bureau compiled the comments of organizations, like the American Medical Association and the New York Academy of Medicine Consultants, that had expressed doubts about the effectiveness of "'Regimen Tablets," and that the Bureau had brought these well-documented expressions of doubt to the attention of Andre and his associates in the hope that the extravagant unsupported claims would be withdrawn; and that the attempts of

7. See pp. 430, 431 infra.

the Bureau were entirely unsuccessful, even when the Bureau's President personally carried its case to Andre in October 1957. On several occasions several advertising media detailed to Andre and his associates their doubts as to the effectiveness of "Regimen Tablets" and the truthfulness of the scientific claims made for the product. The Kansas State Board of Health refused to allow "Regimen Tablets" to be advertised in Kansas on the ground that the Andre-sponsored clinical studies did not substantiate the claims made for "Regimen Tablets." Although Andre knew this, his only response was to dispatch an agent to Kansas in an attempt to get the Kansas Board to reverse its position. Finally, it was established that in July 1959 a Better Business Bureau bulletin and an article in the New York Times reported the results of the clinical study conducted by Dr. Joseph F. Fazekes of the District of Columbia General Hospital, and others. This study, recognized as authoritative by experts on the problem of obesity, concluded that those patients who had taken the "Regimen" dosage of 75 mg. of PPA, as well as double that dosage, lost no more weight than those taking a placebo. Andre and his associates knew of this report and discussed its conclusions but nevertheless failed to modify the advertising claims made for "Regimen Tablets." We think this evidence substantially supports the Government's position that the "without dieting" and "proven clinically effective" claims made by appellants for "Regimen Tablets" were scientifically false, that appellants knew they were false, and that, knowing of the falsity, they nevertheless continued to include these claims in their advertising.

We find equally convincing the Government's evidence that many of appellants' advertising claims were factually false, that appellants knew these claims to be false, and that they nevertheless continued to include them in their "Regimen Tablet" advertising. Most of the Government's evidence, relating to this branch of its case, concerned statements made by various of the "live" endorsers. Since this evidence was largely cumulative we think it suffices for our purposes to summarize the Government's case as it related to the first of the "live" endorsers only, a Mrs. Dorothy Bryce. Mrs. Bryce stated on national television that until she began to take "Regimen Tablets" she had been unable to lose weight, that "without dieting" the tablets had caused her to lose 25 pounds in six weeks, and that she "never felt better" than she did during this period of rapid weight loss. In fact, as Mrs. Bryce testified at trial, she had previously successfully reduced her weight through dieting, she had continued to diet strenuously during the six week period in which she lost the 25 pounds,[8] and she became ill during this period of strenuous dieting. Other "live" endorsers also testified that they strenuously dieted in order to lose weight, and then attributed this weight loss to "Regimen Tablets" during their nationwide television appearances.[9]

In order to establish that appellants knew the statements made by the "live" endorsers were factually false the Government first introduced testimony of the endorsers to the effect that they had been instructed to diet when they were hired: George Levine, the liaison between Kastor-Hilton and Andre,

---

8. During the first three weeks she ate only lean meat, lettuce, tomatoes, grapefruit, and boiled eggs. By the middle of the fourth week her daily meal was: half a grapefruit, yogurt, and a small piece of lean meat or fish. During the sixth week she began to eat only a half grapefruit and some yogurt each day, and during the last days of that week she had only black coffee and cigarettes.

9. In order to prove appellants' advertising claims were factually false the Government also introduced appellants' pleas of guilty to certain counts contained in a New York State information, filed on June 10, 1960, charging them, and Kastor-Hilton, with violating Section 421 of New York's Penal Law, McKinney's Consol. Laws, c. 40, which proscribes untrue and misleading advertisements. N.Y.Penal Law, § 421.

corroborated this by testifying that when Andre interviewed endorsers he invariably asked them whether they had dieted before and impressed upon them the fact that "Regimen will not burn off fat!" The Government also introduced substantial evidence tending to prove that many of Kastor-Hilton's employees, including Richard King, who was in control of the "live" endorser campaign, knew that Bryce and the other endorsers were dieting. George Bailey, a former account executive for "Regimen Tablets," testified that there was much general discussion at Kastor-Hilton to the effect that the endorsers were dieting. Finally, the Government established that Kastor-Hilton kept Andre well informed about the progress of the "live" endorsers' campaign, and that Andre in turn supervised that campaign closely. Viewed cumulatively, the evidence adduced by the Government convincingly established that many of the claims made by the "live endorsers" were factually false. The Government's evidence was also sufficient to support the proposition that appellants knew these claims were false. The Government did not prove that Andre specifically directed Kastor-Hilton to advertise the factually false claims, knowing them to be false, but as he reviewed and approved the "live" endorser campaign this does not insulate him from liability for their propagation. Harris v. United States, 261 F.2d 792, 796 (9 Cir. 1958), cert. denied, 360 U.S. 933, 79 S.Ct. 1446, 3 L.Ed.2d 1546 (1959). Andre's agent, the Kastor-Hilton agency, certainly knew that the endorsers' statements were factually false and it was permissible for the jury to infer that Kastor-Hilton, through Levine, conveyed this fact to Andre.[10] United States v. Press, supra, 336 F.2d at 1009; see United States v. Lichota, 351 F.2d 81 (6 Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 647, 15

L.Ed.2d 540 (1966). The jury's verdict may be upheld on this ground alone, but we add as an alternative ground for upholding it that a person in Andre's shoes should not be able to insulate himself from liability under 18 U.S.C. §§ 1341 and 1343 by contending he was not told that the claims made for his product by his advertising agency were false, even if the contention should happen to be true. We would hold, if it were not so clear that we need not reach the point, that Andre had some affirmative duty to insure that the claims the agency made for "Regimen Tablets," his product that he had arranged to have advertised by the agency, were true. See United States v. Baren, 305 F.2d 527, 532 (2 Cir. 1962); Stone v. United States, 113 F.2d 70, 75 (6 Cir. 1940). A person in Andre's shoes, having failed totally to discharge this responsibility in even the slightest measure, should not be permitted to escape the consequences of his inattention.[11]

Before this court, appellants raise no substantial question as to the sufficiency of the evidence adduced by the Government and summarized above. Appellants do advance nine grounds that they urge require us to reverse the judgments of conviction entered below. They first urge that all the convictions for violating 18 U.S.C. §§ 1341 and 1343 must be reversed, because the Government failed to adduce proof of an essential element of guilt under those sections. Second, appellants argue that alleged prosecutorial misconduct denied appellants a fair trial. Appellants raise four questions concerning the admission of allegedly inadmissible evidence, each of which they contend requires reversal. One portion of the trial court's charge to the jury is alleged to have denied appellants a fair trial because it was hopelessly confusing. Finally, appellants argue there was insufficient evidence to

---

10. Thus we do not decide, and need not, whether Kastor-Hilton's knowledge that the claims were false should in any event be imputed to Andre on the ground that the former was the agent of the latter.

11. We state this as an alternative ground in order to make it clear that we are holding that the Government sufficiently proved that Andre knew the claims were false.

convict on the conspiracy count and on the misbranding count, and they raise several other questions that relate to the misbranding count alone. We turn to consider each of the grounds for reversal urged by appellants.

Appellants argue that all the convictions for violating 18 U.S.C. §§ 1341 and 1343 must be reversed because the Government failed to prove, as to each of the substantive counts on which they were convicted, that some person or persons were actually defrauded. Appellants recognize that the great weight of authority is to the effect that in prosecutions for mail fraud or wire fraud it is not essential that the Government allege or prove that purchasers were in fact defrauded. E. g., Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Gusow v. United States, 347 F.2d 755, 756 (10 Cir.), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). They also recognize that this is the settled rule in this circuit for wire fraud prosecutions, e. g., United States v. Whiting, 308 F.2d 537, 540 (2 Cir. 1962), cert. denied, Crowe v. United States, 372 U.S. 909, 919, 83 S.Ct. 722, 9 L.Ed.2d 718 (1963), and that this rule, in this circuit, has long been considered equally well settled in prosecutions for mail fraud. E. g., United States v. Rowe, 56 F.2d 747, 749 (2 Cir.) (L. Hand, J.), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932). Nevertheless, they argue that this court in United States v. Baren, supra, reversed this established rule and that proof that purchasers were defrauded is now required in all mail fraud prosecutions; they argue further that the "logic" of the new Baren rule requires its application to wire fraud prosecutions as well. We disagree. To be sure, this court did state, in passing, in Baren that "[i]n every mail fraud case, there must be a scheme to defraud, representations known by defendants to be false and some person or persons must have been defrauded." 305 F.2d at 528. But

we think it clear that the Baren panel did not intend that this statement should overrule prior decisions in this circuit, for no mention was made of these prior cases, nor was it stated that a new rule was being formulated. Moreover, had a member of the court believed that Baren had overruled United States v. Rowe, supra, and its progeny, the decision would have been committed to all the qualified judges sitting in banc. See Tellier v. Commissioner of Internal Revenue, 342 F.2d 690, 692 n. 3 (2 Cir. 1965), aff'd on other grounds, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). For all of these reasons the portion of Baren quoted above can only be understood as a *sui generis* exception, suggested by the peculiar facts of *Baren,* to the general rule that in prosecutions under 18 U.S.C. § 1341 the Government is not required to prove that individual purchasers were actually defrauded.[12] *Baren* involved a prosecution for an allegedly fraudulent scheme to sell knitting machines to housewives: at the outset the court in that case stressed the "fundamental fact" that there was "no charge in the indictment that the machine was in any way defective or that it was incapable of performing a satisfactory knitting job." 305 F.2d at 529. In a case like *Baren,* in which the product apparently could do what its advertising, and its other promotional matter said it could do, it may well be advisable to require that the Government produce evidence tending to prove that, despite this, purchasers were in some manner defrauded; otherwise honest merchants could, without justification, become the victims of "a few disgruntled purchasers." 305 F.2d at 533. Cf. United States v. Rabinowitz, 327 F.2d 62 (6 Cir. 1964). But what was said in *Baren* has no application in the present case or in a case like the present case. Here the Government's claim, a claim amply supported by its trial proofs, was that the product in question was totally unable to do what its advertising and other promotional material said it

---

12. The fact that other courts in other circuits have read *Baren* as meaning more than this is not determinative in this court.

could do; in such a case proof that particular purchasers were individually defrauded is completely superfluous.

 Appellants' second argument is that they were denied a fair trial because Martin Pollner, the Assistant United States Attorney who prosecuted the case, improperly collaborated with one Peter Wyden, author of a book "The Overweight Society," which dealt in part with the "Regimen" fraud and was published on March 22, 1965, and of a magazine article dealing exclusively with the "Regimen" fraud, which appeared in the May 1, 1965 issue of "T. V. Guide." We find this argument unconvincing. In the first place, we cannot characterize Pollner's conduct as improper. Pollner, on several occasions, permitted Wyden to examine, in his (Pollner's) office, depositions which were a matter of public record that had been taken in connection with a previous civil libel proceeding against "Regimen Tablets" commenced by the Food & Drug Administration. Pollner refused to comment on the then pending criminal prosecution, he requested a pre-publication copy of the book so that he could check its contents, and he repeatedly urged Wyden to ask his publishers to delay publication until after the trial. Once Pollner learned Wyden had agreed to write an article on the "Regimen" fraud for "T. V. Guide" he asked that the article not be published until the trial was concluded. Wyden and his publishers ignored Pollner's requests and both the book and the magazine article were published before the trial's conclusion.[13] It seems clear that Pollner took no steps to ignite interest in having any material published that dealt with the "Regimen" fraud; this interest had already been kindled by the FDA's earlier civil libel proceeding against "Regimen Tablets" and the earlier New York State prosecution of these appellants and others for violating that state's false advertising statutes.[14]

Thus, this is clearly not a case in which the prosecution itself initiated the intrusion of the press into the process of the trial. Compare Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 1521, 16 L.Ed.2d 600 (1966); Stroble v. State of California, 343 U.S. 181, 201, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (Frankfurter, J., dissenting). Secondly, the trial court on two occasions asked the jury specifically whether they had read either the book or the magazine article and on both occasions each juror replied in the negative. Furthermore, the court repeatedly and emphatically admonished the jury to avoid all contact with any publicity concerning the case. Appellants point to no facts tending to establish that the jury did read this material or otherwise disobey the trial court's instructions. In view of the court's cautionary instructions, and bearing in mind that the book and the magazine article largely rehashed admissible evidence, we are satisfied that appellants were not prejudiced. See, e. g., United States v. Agueci, 310 F.2d 817, 832, 99 A.L.R.2d 478 (2 Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). To be sure, prejudice is inherent in certain situations, Sheppard v. Maxwell, supra at 1517, but the present set of facts can hardly be considered such a case.

We turn next to the four issues appellants raise that concern the admission at trial of allegedly inadmissible evidence.

 They argue first that the court below erred in admitting in evidence testimony and documents tending to prove that several impartial observers like the National Better Business Bureau and the Kansas State Board of Health brought reports highly critical of "Regimen Tablets" to appellants' attention. As support for this position appellants note that the contents of these reports were hearsay and thus inadmis-

---

13. That Pollner could have done more than strenuously urge a delay in publication may be doubted. See Sheppard v. Maxwell, 86 S.Ct. 1507 (1966).

14. See note 9, supra.

sible to prove the truth of the matter asserted therein—the total ineffectiveness of "Regimen Tablets." The evidence was admitted for a limited purpose only. The trial court permitted the Government to introduce it only after carefully and repeatedly instructing the jury that the evidence was only admissible as tending to prove that appellants knew there was a widespread belief among experts that "Regimen Tablets" were ineffective. This evidence was admissible, under these limiting instructions, on this limited issue of notice. E. g., United States v. Press, 336 F.2d 1003, 1011–1012 (2 Cir.), cert. denied, 379 U.S. 965, 85 S.Ct. 658 (1964); McCormick, Evidence § 228 (1954). Appellants also seem to argue that even if this evidence was admissible on the issue of notice it should have been excluded because it was so prejudicial. We disagree. Proof that appellants knew the experts disbelieved the claims made for "Regimen Tablets"—taken together with the undisputed fact that appellants failed to qualify the claims—was the linchpin of the Government's argument that appellants intended to defraud the public. In any event, we fail to understand how this evidence could have seriously prejudiced appellants; there was much admissible evidence tending to prove "Regimen Tablets" were totally ineffective.

 Appellants' second contention as to the admission of evidence is that the testimony of Drs. Mayer and Grollman should not have been admitted because it did not represent a "universality of scientific belief" that "Regimen Tablets" were ineffective—the test appellants allege was established by the Court in Reilly v. Pinkus, 338 U.S. 269, 276, 70 S.Ct. 110, 94 L.Ed. 63 (1949). This objection fails to note an important distinction between Reilly v. Pinkus, supra, and the present case. There the Government sought to use expert medical testimony not only to establish that certain product claims were false but also to establish that the claims had been ad-

vertised as part of an intentional scheme to defraud. In the present case the Government proved that appellants intended to defraud by other evidence than that of the two doctors, such as the testimony tending to prove appellants were aware of adverse expert opinion, and chose to disregard it. The testimony of Dr. Mayer and Dr. Grollman was introduced only to establish that the advertising claims made for Regimen were scientifically false and was admissible for this purpose. McCormick, Evidence §§ 13–15 (1954).

Third, appellants allege error by the admission into evidence of their pleas of guilty interposed in the New York courts to certain counts of an information charging them with committing a misdemeanor by falsely advertising "Regimen Tablets" as a "no diet," "proven clinically effective" drug, in violation of the New York false advertising statutes.[15] Intent to defraud is not an element of false advertising under New York laws. It is difficult to state precisely appellants' objection to the admission of this evidence except to say that they consider its introduction prejudicial. To be sure, this evidence tended to prove one element of the Government's case in this federal proceeding. Under New York law the guilty pleas entered by appellants in the state proceeding were formal judicial admissions of the allegations contained in the information. People v. Mason, 307 N.Y. 570, 122 N.E. 2d 916 (1954). Thus appellants had admitted they disseminated advertisements for "Regimen Tablets" that were factually and scientifically false. The trial court instructed the jury that the guilty pleas were admissible only to prove the falsity of the claims and constituted no proof of intent to defraud. Thus limited this evidence was properly admitted. Myers v. United States, 49 F.2d 230, 231 (4 Cir. 1931); McCormick, Evidence § 242 (1954).

 The final claim that inadmissible evidence was admitted into evidence

---

15. See note 9, supra.

concerns the testimony of a Miss Ethel Rosenthal, employed by a Dr. Milton Plotz as a secretary-receptionist from 1942 until his death in 1962. Appellants object on imprecise grounds that this testimony should have been excluded as prejudicial. Dr. Plotz was one of several doctors hired by appellants to conduct clinical tests establishing the effectiveness of "Regimen Tablets." The Plotz clinical report was introduced below by Kastor-Hilton as tending to prove that there was clinical proof of the effectiveness of "Regimen Tablets." The Plotz report, which was favorable, purported to be based on the experience of 50 patients drawn from Dr. Plotz's practice in internal medicine. It stated that 46 of the original 50 subjects continued to participate in the test for the full test period of 10 weeks. Charts accompanying the Plotz report indicated that each of the 46 subjects was examined and weighed by Dr. Plotz each week for a period of 10 successive weeks. The testimony of Miss Rosenthal tended to disprove this for she testified she knew the patients named as participants in the clinical test survey and that during the time in question none of them came to see the doctor every week for a 10 week period or for even a two week period. The trial court carefully limited the admissibility of this evidence to the issue of the validity of the Plotz clinical survey and report. This evidence was relevant to the issue on which it was offered and we hold it was admissible for that purpose. See McCormick, Evidence §§ 151–52 (1954).

Appellants' remaining contentions are conclusory and wholly without merit. They argue, without a shred of evidentiary support, "that the conspiracy charged in this indictment was not proved, simply as a matter of the manifest deficiencies of the trial proofs." To the contrary, the Government's proofs, summarized above, amply support the proposition that Andre, Drug Research Corporation, and Kastor-Hilton conspired to perpetrate a fraud. A verdict supported by such substantial evidence cannot be disturbed. United States v. Tutino, 269 F.2d 488, 490 (2 Cir. 1959).

Appellants readily concede that the trial judge, in his charge, faced with the heavy intellectual burden of delineating to the jury the various statutory elements of mail fraud, wire fraud, conspiracy to defraud, and misbranding, as those elements related to the facts the Government adduced at trial in support of the allegations in the 58-count indictment, did a thoroughly commendable job. They argue, however, that near the conclusion of his long uninterrupted charge [16] he summarized what he had previously said and in so doing rewrote the indictment and eliminated from the jury's consideration the presumption of appellants' innocence and the requirement that guilt be proved beyond a reasonable doubt. This claim of error is entirely lacking in substance. Viewing the trial judge's charge to the jury as a whole, as we should, see United States v. Marchisio, 344 F.2d 653, 670 (2 Cir. 1965), we are convinced that he vigilantly protected all of appellants' rights.

Appellants argue that the jury verdict on the misbranding count must be reversed for failure of proof and because it appeared to be a compromise verdict; they further assert that the misbranding conviction is inextricably connected with the convictions on the other counts and that the arguments for reversal of these other judgments of conviction thus apply to the misbranding conviction as well. These contentions also lack merit. There was evidence sufficient to convict on the misbranding count and the evidence on this count was kept separate from the evidence on the mail and wire fraud counts in the indictment. It is true that the indictment contained 12 misbranding counts and the jury returned a guilty verdict on only one of them. This does not, however, in this case, indicate a compromise verdict: the jury had not yet reached

16. Pp. 5621–5878 of the trial record.

any verdict as to the remaining 11 counts when the trial court, without objection, accepted the jury's verdict up to that point as a final verdict as to all counts. And even if this disposition indicated a compromise or inconsistent verdict, it would not necessitate reversal for prejudicial trial error because it is well settled that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932).

The judgments of conviction are affirmed in all respects.