**PRODAN, Appellee,**

v.

**HEMEYER, Appellant, et al.**

[Cite as *Prodan v. Hemeyer* (1992), 80 Ohio App.3d 735.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 60950.

Decided July 27, 1992.

*Dinn, Hochman & Melamed, Alan L. Melamed* and *Ari H. Jaffe,* for appellee.

*Bilfield & Sandel Co., L.P.A., Murray D. Bilfield* and *A. Clifford Thornton, Jr.,* for appellant.

---

KRUPANSKY, Judge.

Defendant appeals from an order of the trial court granting judgment for plaintiff on plaintiff's complaint in the amount of $27,475 and granting judgment for plaintiff on defendant's counterclaim. The relevant facts follow:

Plaintiff and defendant met sometime in the 1970s while working at the same company. Plaintiff, originally from Yugoslavia, worked at the company as a machinist; defendant worked at the company as a computer programmer.

In 1980, plaintiff and defendant decided to start a machine shop business together. Therefore, each contributed something to begin the new machine shop business: plaintiff donated some money and a lathe machine while defendant contributed money. Both men considered that they contributed equally to the start-up costs of the business.

In June 1980, the machine shop business was registered with the state of Ohio as a corporation known as "Cloverleaf Industries" (hereinafter "Cloverleaf"). Five hundred shares of stock were thereafter issued in the corporation. Plaintiff held two hundred fifty shares of stock, and defendant held two hundred fifty shares of stock. Furthermore, defendant held the corporate offices of president and secretary during the same period plaintiff held the corporate offices of vice-president and treasurer.

Cloverleaf rented space in a building located at 7777 Wall Street in Valley View, Ohio, and began doing business. Plaintiff did most of the actual machining and defendant performed more of the "office" duties of the business. From 1980 until 1984 both men considered they each contributed equally to the business and were equally compensated.

In 1985, plaintiff "received" $27,400 in wages from Cloverleaf; however, it was established at trial that in 1986 plaintiff "loaned" $20,000 back to Cloverleaf. Therefore, the business compensation to the parties in 1985 remained even, each party receiving a wage of $7,400 for 1985. Also in 1985, since revenues were decreasing, plaintiff and defendant began to seek a buyer for Cloverleaf.

In January 1986 Cloverleaf was sold.

In February 1986, as the completion of the sale of the business was pending, plaintiff applied for and received state unemployment compensation. Defendant did not. However, since Cloverleaf's records showed Cloverleaf had paid defendant only $7,400 in 1985, defendant's unemployment compensation would have been negligible.

From January 1986 until June 1986, both plaintiff and defendant made efforts to help Cloverleaf's buyer assume the operation of the business. However, their efforts were unavailing, since the sale of the business was not completed. Therefore, the business's machinery was returned by August 1986. Thereafter, Cloverleaf continued to operate from the Valley View location while defendant sought a new buyer. Apparently, sometime during this time period the relationship between plaintiff and defendant began to deteriorate.

In December 1986 plaintiff's unemployment compensation ceased.

On December 26, 1986, on company letterhead, defendant issued a "recall notice" to plaintiff, which stated as follows:

"To ERMANO PRODAN.

"This is your layoff *RECALL NOTICE.*

"Mr. Prodan, you are being RECALLED to work starting 12–26–86.

"Please indicate below your intentions." [1]

In January 1987, using Cloverleaf funds, defendant paid the state of Ohio the fee required for Cloverleaf to remain operating as a corporation. Also in January 1987, however, defendant caused plaintiff's name to be removed as signator from the corporate bank accounts.

In February 1987, plaintiff found new employment.

On March 2, 1987, plaintiff signed the "recall notice" indicating his intention to return to work; however, defendant testified at trial he did not permit plaintiff to return to work. Also during the month of March 1987, defendant did the following: (1) gave himself a salary for 1986 from Cloverleaf in the amount of $20,000; (2) removed a Cloverleaf "company" car from plaintiff's possession; and (3) attempted to elect his son to the corporate offices held by plaintiff. Plaintiff did not agree to the election; therefore, he retained his corporate offices.

In June 1987 defendant sold Cloverleaf's two "company" cars for $8,175 each.

In July 1987 defendant stated at trial he decided to "resign" from Cloverleaf. Defendant then began a new business called "J.H. Industries." The record reveals that by August 1987 J.H. Industries was doing business with Cloverleaf's former customers. Defendant performed some work for these customers on Cloverleaf's behalf and performed some work for these customers on behalf of J.H. Industries.

---

**1.** At trial, plaintiff testified he did not receive this notice in December 1986, but, rather, he received it at the end of February 1987.

In July 1987 Cloverleaf's lease at 7777 Wall Street expired. Thereafter, defendant continued paying the lease for Cloverleaf out of the business bank account on a month-to-month basis until November 1987. After that month, since no notice of termination was given, Cloverleaf's rent began to accrue.

On his 1987 Federal Income Tax Form 1040, defendant stated he realized a profit from J.H. Industries in the amount of $17,900 for that year.

In August 1988 Cloverleaf was closed by the leaseholder. In January 1989 the remaining assets of Cloverleaf were sold at auction and the proceeds used to satisfy the business creditors. The balance remaining in Cloverleaf's bank account was $600. Plaintiff received neither monies from the final sale of the business nor any of the money remaining in Cloverleaf's bank account.

On July 10, 1989 plaintiff filed an action in the Cuyahoga County Court of Common Pleas against defendant and Cloverleaf. Therein, plaintiff alleged that both he and defendant were directors and fifty-percent shareholders of Cloverleaf, that a deadlock arose between plaintiff and defendant, and that defendant made efforts to deny plaintiff's rights as an officer, shareholder and director of Cloverleaf. Plaintiff further alleged that defendant had intentionally and fraudulently committed the following acts: (1) removed plaintiff's name as signator on Cloverleaf's bank accounts; (2) improperly obtained and sold plaintiff's company car; (3) gave himself an unauthorized salary; and (4) denied plaintiff employment and access to the corporate premises. Plaintiff further alleged defendant had wasted and mismanaged the corporate assets. Finally, plaintiff alleged the following:

"14. By terminating Plaintiff's position as Director/Officer, denying Plaintiff access to the corporate premises, removing Plaintiff as signator from the corporate bank account, selling Plaintiff's corporate car, and authorizing payment to himself of salary and denying Plaintiff his salary, share of the profits and share of distribution of corporate assets all without authorization and over the objection of Plaintiff, *Defendant* Hemeyer, outside of the scope of his corporate authority, *has intentionally and willfully breached his duty to Plaintiff.*

"15. As a result of the acts of Defendant Hemeyer in violation of the Articles of Incorporation, Code of Regulations and Policy of the corporation, *Defendant has deprived Plaintiff of his benefit of the corporation* and has denied him an equal return on his investment." (Emphasis added.)

Plaintiff thus prayed for judgment in the amount of $20,000 in compensatory damages and $20,000 in punitive damages.

Defendant filed an answer denying plaintiff's allegations of wrongdoing and setting forth affirmative defenses. Defendant also set forth two counter-

claims against plaintiff. The first counterclaim alleged the following: (1) plaintiff had abandoned the corporation in June 1986; (2) plaintiff had "refused to cooperate in good faith in the winding up of the affairs of the corporation causing loss in the value of the corporation business eviction [*sic*] from its leasehold and forced sale of its assets, all at a loss to defendant in an amount approximating $15,000"; and (3) plaintiff was "$20,000 ahead of defendant in gross wages coming from the corporation * * *." Defendant therefore prayed for $35,000 in compensatory damages. Defendant's second counterclaim alleged plaintiff had refused to repay a personal loan made by defendant to plaintiff. Plaintiff answered defendant's counterclaims denying the relevant allegations made by defendant.

The case then proceeded to arbitration. Following the hearing, the arbitration panel awarded plaintiff $20,000 on his complaint and found for the plaintiff on defendant's counterclaims. Defendant filed a notice of appeal from the award of the arbitrators to the trial court. Thereafter, the case proceeded to a bench trial. The trial court heard testimony from plaintiff and defendant and their witnesses. The trial court also admitted into evidence *inter alia* the following: (1) Cloverleaf corporate records; (2) a letter from defendant to plaintiff concerning the company car; (3) the "recall notice" to plaintiff; and (4) a "notice of election" of defendant's son to corporate offices. Following the hearing, the trial court granted judgment for plaintiff in the amount of $27,425 and granted judgment for plaintiff on defendant's counterclaims.

Defendant filed a timely notice of appeal from the judgment of the trial court asserting two assignments of error.

Defendant's first assignment of error follows:

"The court erred in finding that defendant breached a duty to plaintiff."

This assignment of error lacks merit.

■ Defendant argues he fulfilled his fiduciary duty toward plaintiff and that his duty ceased when plaintiff refused "to assist in the preservation of this [*sic*] own assets." This argument is unpersuasive.

In *Wing Leasing, Inc. v. M & B Aviation, Inc.* (1988), 44 Ohio App.3d 178, 542 N.E.2d 671, the court made the following observations concerning the fiduciary duty owed by a corporate officer:

"It is well-established that a corporate officer occupies a position of trust in relation to his corporation. *Thomas v. Matthews* (1916), 94 Ohio St. 32, 43, 113 N.E. 669, 671. Such relationship imposes upon directors duties in the nature of a fiduciary obligation. *Id.;* [citations omitted]. The principles which govern the fiduciary relationship between a corporation and its di-

rectors include a *duty of good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure.* [Citations omitted.]" (Emphasis added.)

This court has also stated in *Apicella v. PAF Corp.* (1984), 17 Ohio App.3d 245, 247, 17 OBR 512, 514, 479 N.E.2d 315, 318, as follows:

"It is well-established 'that directors of a corporation occupy a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds or property are wasted or mismanaged * * *.' [Citations omitted.] A director must perform his duties in good faith and in a manner he reasonably believes to be in the best interests of the corporation. R.C. 1701.59(B).

" * * * [T]ransactions allegedly involving self-dealing * * * will be closely scrutinized."

Plaintiff in the case *sub judice* was required to prove by clear and convincing evidence that defendant breached a fiduciary duty owed to Cloverleaf and plaintiff as a Cloverleaf shareholder. R.C. 1701.59. Appellate review of the trial court's decision on this issue is guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Since the weight of the evidence and the credibility of the witnesses are primarily the prerogative of the factfinder, "[a] finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.* at 81, 10 OBR at 412, 461 N.E.2d at 1277.

In the case *sub judice,* plaintiff presented clear and convincing evidence in the form of testimony and Cloverleaf business records to support the allegations of his complaint. With regard to his allegation that defendant denied plaintiff employment with Cloverleaf and denied plaintiff's rights as an officer, shareholder and director of Cloverleaf, plaintiff testified as follows:

"Q. Why did you go to work everyday?

"A. Because I want to help him after we sell this company, and when we no have work, we just paint the machine and cleaning like that for customer when they come look for machine they want to buy it.

"Q. Did there come a time where you received some sort of written notice from Mr. Hemeyer about returning to work?

"A. I never receive from Mr. Hemeyer in '86, no notice. In '87, in February 28th, he gave me the notice.

" * * * *

"Q. Now, this is a return to work notice saying that you are being recalled as of December 26, 1986; is that correct?

"A. Yes.

"Q. When did you actually receive this notice?

"A. I receive in February 28, '87. I received the notice.

"* * *

"Q. What did you say? What was the reaction?

"A. At first he make me mad, but later on I say can I think this over. I took this home. I think over, then I call him back. We come back down, and I give him the recall notice, sign it. I want to return to work, and he say you can't work anymore over here.

"Q. How long did you hold on to this notice before you turned it back to him?

"A. One day."

Furthermore, plaintiff called defendant as a witness and upon cross-examination, defendant testified as follows:

"Q. I'm asking you a very simple question. Did Mr. Prodan ever authorize you to take his name off the corporate bank account of Cloverleaf Industries?

"A. No.

"Q. And, in fact, in March of 1987, Mr. Prodan demanded that you put his name back on the corporate account; isn't that true?

"A. Yes, he asked.

"Q. And you refused?

"A. Correct."

With regard to the allegation that defendant appropriated plaintiff's company car and Cloverleaf funds to his own use, plaintiff presented his own testimony and the following testimony of defendant:

"Q. All right.

"A. Wait, excuse me, sir. I guess I didn't take over, it was dumped on me when he deserted the business.

"Q. Well, in 1987, while you had sole control, is that fair?

"A. Okay.

"Q. While you had sole control of Cloverleaf Industries you took $20,000 in salaries, and out of J.H. Industries you had gross earnings of another $15,166; is that correct?

"A. Correct.

"\* \* \*

"Q. You obtained [the car] without his permission.

"A. I didn't need it.

"Q. You sold it, sold that car?

"A. Ultimately, six months later. I held onto it so he could purchase it. While he was driving it for six months I paid the insurance and I paid the insurance for one year on the car.

"Q. You sold the car, correct?

"A. Correct.

"\* \* \*

"Q. So the first six months of 1987 you took $20,000 in salary?

"A. Um, that's fiscal.

"Q. Fiscal or not you actually received the funds in March and in June?

"A. Correct.

"Q. So, in fact, you received this within a three month period?

"A. Correct.

"Q. During that same period of time Mr. Prodan received nothing?

"A. Correct."

With regard to his allegation that defendant's acts deprived plaintiff of his benefit of the corporation, plaintiff presented evidence that defendant wasted corporate assets and appropriated Cloverleaf corporate opportunities for the benefit of his own company, J.H. Industries. For example, on cross-examination, defendant admitted plaintiff was not consulted about defendant's decision to continue to lease space at 7777 Wall Street on a month-to-month basis after July 1987. Furthermore, defendant admitted he did not give the leaseholder of 7777 Wall Street notice of intent to terminate the lease and, therefore, overdue rent began to accrue after defendant stopped paying the rent in November 1987.

Moreover, plaintiff presented evidence that defendant usurped a corporate opportunity. Defendant paid the state fee which allowed Cloverleaf to continue operating as a corporation for 1987. Defendant stated at trial he decided to quit Cloverleaf in July 1987. However, there was neither a written statement to that effect nor was Cloverleaf dissolved. Defendant simply started a new business and began supplying work for Cloverleaf's largest customers.

The usurpation of a corporate opportunity is established when the corporation shows that (1) the officer or director acquired information about

the opportunity while acting for the corporation; and (2) the opportunity is in the corporation's line of business. *Hubbard v. Pape* (1964), 2 Ohio App.2d 326, 31 O.O.2d 475, 203 N.E.2d 365.

"The doctrine of corporate opportunity is a corollary of the undivided loyalty rule. The rule, which prohibits a director or officer from placing himself in a position of conflicting loyalties and subsequently violating his primary duty to the corporation, naturally prevents the director from appropriating an opportunity from the corporation. [Citation omitted.]" *Michals Ent., Inc. v. Alexandrou* (Nov. 21, 1984), Cuyahoga App. No. 48016, unreported, 1984 WL 3617. Where evidence of the usurpation of corporate opportunity is presented,

" * * * the fiduciary bears the burden of establishing that an opportunity in the corporation's line of business is unavailable to it because of the wishes of the offeror.

"The burden is shifted for two reasons. First, the fiduciary has been involved in the negotiations. He is in a better position vis-a-vis the corporation to show why the third party was unwilling to deal with the corporation. Secondly, the fiduciary is under a duty to the corporation to use his best efforts to secure the opportunity for the corporation. These efforts are required of him personally, and he must show them before he can compete with the corporation." *Id.*

The documentary evidence in the case *sub judice* indicates only that Cloverleaf's two main customers became J.H. Industries' customers. Moreover, as part of plaintiff's case, defendant testified on cross-examination as follows:

"Q. One of those being a purchase order number 10436 from Empire to Cloverleaf Industries, that's 7777 Wall Street, Valley View, Ohio; is that correct?

"A. (Indicating), that's correct.

"Q. 7777 Wall Street, Valley View, Ohio was the address of Cloverleaf Industries, correct?

"A. Yes, it was, sir.

"Q. And that was in September of '87?

"A. Correct.

"Q. So in September of '87, Empire obviously was still of the impression that it was doing business with Cloverleaf Industries, correct?

"A. I did do spot jobs for Cloverleaf, yes, I did, and the reason being—

"Q. So you continued to do work on behalf of Cloverleaf Industries for Empire at the same time that you were doing work for Empire for your own company, J and H Industries?

"A. Correct."

Although defendant testified on his own behalf in his case in chief, on cross-examination he stated the following:

"Q. Since you continued to pay rent on the Cloverleaf facility there is absolutely nothing that prevented you from providing those same services for those customers by Cloverleaf, particularly in view of the fact that you were paying rent at Cloverleaf; isn't that true?

"A. Well, as a matter of fact, if I'm not mistaken, we went over this same question, and I did perform a few spot services, but—

"Q. You could have done it on behalf of Cloverleaf Industries instead of just on your own behalf as J.H. Industries?

"A. Possibility, anybody could have done that.

"Q. Not just possible, it in fact can be done; isn't that right?

"A. It could be done.

"Q. It could have been done, correct? And J & H couldn't have made a dime if you hadn't had Empire and Pettibone as your customers?

"A. Not necessarily. I could machine metal for anybody in this town.

"Q. Okay. But the ones you were doing it for was Pettibone and Empire though, right?

"A. Absolutely. I want to do it."

The foregoing testimony clearly shows defendant's usurpation of Cloverleaf corporate opportunities for his own benefit. *Michals Ent., Inc. v. Alexandrou, supra; Apicella v. PAF Corp., supra.*

▇ Cloverleaf remained a viable corporation in 1987, retaining assets, machinery and a place of business. Since Cloverleaf was not "defunct," defendant still owed a fiduciary duty to Cloverleaf and its shareholders in 1987. *Apicella v. PAF Corp., supra; Dewey v. Hayes* (July 19, 1979), Cuyahoga App. Nos. 39725 and 39726, unreported. Cf. *Herr–Morr, Inc. v. Herring Ent., Inc.* (Oct. 27, 1988), Cuyahoga App. No. 54540, 1988 WL 114482. Therefore, the trial court did not err in its determination that based upon clear and convincing evidence defendant had breached a fiduciary duty to plaintiff.

Accordingly, defendant's first assignment of error is overruled.

Defendant's second assignment of error follows:

"The trial court failed to properly apply the measure of damages."

This assignment of error has merit.

■ Defendant argues the trial court's award of $27,425 was improper and amounts to a "windfall" to plaintiff, since plaintiff did not equally contribute to Cloverleaf in 1987; however, this argument is only partly persuasive.

■ Ordinarily, the remedy for a director's breach of duty which results in a benefit to the director at the expense of the corporation is disgorgement of profits. *Apicella v. PAF Corp., supra.* Moreover, in *Hubbard v. Pape, supra,* the court determined the following when discussing the remedy a corporation is entitled to when one of its fiduciaries has appropriated its business opportunity:

"It is a general rule in equity jurisprudence that officers and directors of a corporation, who acquire knowledge and information, in their fiduciary capacity, of investment or other business opportunity, in the line of their corporation's business, cannot appropriate the opportunity of financial or business gain for themselves as individuals, if the opportunity would be advantageous to their corporation and the corporation is financially able to accept the opportunity and make the advantageous acquisition. Where corporation officers fail as fiduciaries to protect the interests of their corporation, and are found to have appropriated a corporate opportunity to their own personal gain, such officers may be required to transfer, to the corporation, the opportunity of which they have personally taken advantage, and account to the corporation for their inequitable profits." *Id.,* 2 Ohio App.2d at 329–330, 31 O.O.2d at 477, 203 N.E.2d at 368. See, also, *Cuyahoga Carpet Installation, Inc. v. Jablonowski* (Oct. 20, 1988), Cuyahoga App. No. 54361, unreported, 1988 WL 112868; *Dewey v. Hayes, supra.*

In the case *sub judice,* the trial court made its award of damages based upon a finding that Cloverleaf remained a viable corporation in 1987. The trial court then determined the following were Cloverleaf assets appropriated *in toto* by defendant:

1. $20,000 in salary;

2. $17,900 in profit, claimed by defendant for J.H. Industries on defendant's federal income tax form;

3. $16,350 received for the sale of both company cars;

4. $600 remaining balance in bank account.

The total figure for all these assets amounted to $54,850. The trial court then divided that figure in half and awarded the amount to plaintiff on his claim, *i.e.*, $27,425.

Civ.R. 54(C) states in pertinent part the following:

"(C) Demand for judgment. * * * Except as to a party against whom a judgment is entered by default, *every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled; however, a demand for judgment which seeks a judgment for money shall limit the claimant to the sum claimed in the demand* unless he amends his demand not later than seven days before the commencement of the trial. Additional service of process is not necessary upon such amendment." (Emphasis added.)

In the case *sub judice*, plaintiff prayed for $20,000 in compensatory damages and $20,000 in punitive damages. From a review of the record, it is clear the trial court's award to plaintiff was compensatory in nature. The trial court neither stated it was awarding plaintiff punitive damages nor will this court assume a portion of the $27,425 award was for punitive damages. *Weaver v. Colwell* (1992), 73 Ohio App.3d 139, 596 N.E.2d 617. Thus, the trial court's award in the case *sub judice* was excessive. Civ.R. 54(C); *Dewey v. Hayes, supra*. However, although this court may not completely agree with the trial court's determination of damages, this court may not otherwise substitute its opinion for that of the trial court.

Therefore, the judgment of the trial court is modified to reduce the award of damages to plaintiff to $20,000, the amount prayed for in the complaint.

*Judgment affirmed as modified.*

JOHN F. CORRIGAN, P.J., and BLACKMON, J., concur.