UNITED STATES of America, Plaintiff,

v.

Ronald W. SKEDDLE, et al., Defendants.

No. 3:95CR736.

United States District Court,
N.D. Ohio,
Western Division.

May 12, 1997.

---

Jon D. Richardson, Sr., Kaplan, Richardson, Rost & Helmick, Toledo, OH, William M. Connelly, Connelly, Soutar & Jackson, Toledo, OH, Ronald W. Skeddle, Perrysburg, OH, Peter R. Ginsberg, Gold & Wachtel, New York City, Robert Gold, Michael Sommer, McDermott, Will & Emery, New York City, for Ronald W. Skeddle, defendant.

Sheldon S. Wittenberg, Wittenberg & Phillips, Toledo, OH, Stuart G. Nash, Brendan V. Sullivan, Jr., Barry S. Simon, Marcie R. Ziegler, Williams & Connolly, Washington, DC, Darryl J. Costin, Perrysburg, OH, for Darryl J. Costin, defendant.

Jerome Phillips, Wittenberg & Phillips, Toledo, OH, Richard A. Hibey, Gordon A. Coffee, Michael K. Atkinson, Douglas N. Greensburg, Winston & Strawn, Washington, DC, Edward B. Bryant, Toledo, OH, for Edward B. Bryant, defendant.

Gerald Arthur Messerman, Messerman & Messerman, Cleveland, OH, David L. Herzer, Vermilion, OH, for David L. Herzer, defendant.

Niki Z. Schwartz, Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, John E. Martindale, Martindale, Bryztwa & Quick, Cleveland, OH, Joseph G. Corsaro, Bay Village, OH, for Joseph G. Corsaro, defendant.

John J. Callahan, Toledo, OH, John R. Purser, Whitehouse, OH, for John R. Purser, defendant.

John Czarnecki, Cooper, Walinski & Cramer, Toledo, OH, Clarence H. Martin, Gahanna, OH, for Clarence H. Martin, defendant.

J. Michael Murray, Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH, David M. Hobe, Strongsville, OH, for David M. Hobe, defendant.

Norman G. Zemmelman, Britz & Zemmelman, Toledo, OH, Sander Schwartz, Cook, Riley, Smith, Nance & Schwartz, Cleveland, OH, Floyd A. Trouten, III, Strongsville, OH, Richard G. Lillie, Lillie & Holderman, Cleveland, OH, for Floyd A. Trouten, III, defendant.

Robert William Kern, Office of U.S. Attorney, Cleveland, OH, Thomas A. Karol, Office of U.S. Attorney, Toledo, OH, for U.S.

### Order

CARR, District Judge.

This is a criminal case in which the defendants are charged in a superseding indictment with conspiracy to commit and committing mail and wire fraud, laundering, and tax evasion. (Doc. 232). Three of the nine defendants, who will be referred to as the "LOF defendants," are former officers and directors of Libbey–Owens–Ford Company (LOF): the defendant Skeddle was formerly President and C.E.O. of LOF, and the defendants Costin and Bryant were formerly Vice-Presidents of LOF.[1]

The indictment alleges that the LOF defendants, aided by the other defendants, knowingly and willfully used the mails and wire communications to devise schemes and artifices to defraud LOF and to obtain money and property from LOF by means of false and fraudulent pretenses, representations, and promises, and to deprive LOF of the honest services of the LOF defendants. The LOF defendants, according to the indictment, violated their fiduciary duties to LOF by engaging in undisclosed self-dealing, which enabled them to acquire money and property worth several million dollars from LOF.

This was accomplished, the indictment states, by the creation of outside companies controlled by the LOF defendants, including Computer Technology Management (CTM), Energy Systems Management of Ohio (ESMO), Visual Data, Inc. (VDI), and Flexible Automation Systems (FAS). These outside companies then engaged in various transactions with LOF. The indictment also alleges that the LOF defendants received $7.7 million from transactions involving CTM, acquired property worth $1.3 million from the ESMO transactions, earned excessive profits as the result of over billing with regard to the VDI transactions, and, but for the intervening discovery of their undisclosed self-dealing, would have obtained $18 million from contracts with FAS.

The CTM transactions resulted from a decision by LOF to "out source" its management information (i.e., computer) services. According to the indictment, the LOF defendants, working with the defendant Purser, set up CTM to provide those services. The indictment charges that CTM obtained the services from MCN Computer Services, Inc. (MCN). The LOF defendants are alleged to have concealed a proposal from MCN to LOF. The defendant Skeddle allegedly instructed LOF's general counsel, Alan Miller, to negotiate with CTM and told Miller that the defendant Purser had "stretched himself pretty far in terms of the savings he was offering LOF." The defendant Skeddle is also alleged to have told LOF's board of directors that the company would realize substantial savings from the CTM contract. The indictment also alleges that the CTM contract with LOF was at a price far in excess of the fair market value of the services received by LOF.

The indictment states that the LOF defendants, with the aid of the other defendants, took several steps to conceal their activities from LOF, including: use of the defendant Purser as nominee owner of CTM to conceal the LOF defendants' interest in CTM (while also making arrangements to preserve their control over CTM during Purser's nominee ownership); creation of an "audit free trail" to avoid detection of their activities by LOF

---

1. The other defendants, who are alleged to have conspired with and otherwise assisted the mail and wire frauds, money laundering, and tax evasions attributed to the LOF defendants, are: John Purser, former manager of information technology for LOF; David Herzer and Joseph Corsaro, attorneys who provided legal services to the LOF defendants; David Hobe and Floyd Trouten, accountants who provided professional services to the LOF defendants; and Clarence Martin, a university professor who participated in certain parts of the transactions giving rise to the pending indictment.

and its tax accountants (who prepared the defendant Skeddle's tax returns); payment of putative "management fees" by CTM to companies created and controlled by the LOF defendants to obtain, disburse, and conceal the proceeds obtained from LOF as a result of its contract with CTM; and execution of backdated agreements.

With regard to the ESMO transaction, the indictment alleges that the LOF defendants, aided by other defendants and other persons, caused rigged bids to be submitted to LOF for purchase of two gas wells at less than the wells' fair market value. The monies used by the LOF defendants to buy the gas wells are alleged to have come from the proceeds of the CTM contract with LOF. In addition to buying the wells with rigged bids, the LOF defendants, according to the indictment, used a nominee purchaser to deal with LOF; that nominee, in turn, allegedly immediately transferred its interest in the gas wells to ESMO.

With regard to FAS, the indictment alleges that the LOF defendants and other defendants sought to have LOF enter into a contract with FAS to lease robots. The proposed lease with FAS, the indictment alleges, was not negotiated at arms-length and was priced in excess of fair market value, because the machines were to be purchased by FAS for $6 million and leased to LOF for four years for $24 million. The defendants involved in this transaction are alleged to have taken steps deliberately to exclude disinterested LOF officers and board members from financial and legal review and approval of the proposed contract and its negotiation.

With regard to the VDI transactions, the indictment alleges that the defendant Costin caused inflated invoices to be submitted to LOF for services provided by VDI to LOF, and Costin or a subordinate at his direction approved payment of the invoices. The defendants Skeddle and Costin allegedly obtained automobiles and cash from VDI, and Costin is alleged to have received funds for a vacation rental from VDI. The defendant Costin, the indictment states, prepared false documents to conceal the VDI payments from LOF investigators following LOF's discovery of the defendants' self-dealing. The defendant Costin is alleged to have represented falsely that the VDI payments were for consulting services (which were not provided to VDI).

The indictment additionally alleges that the LOF defendants signed agreements to abide by LOF's Standards of Business Conduct, which, *inter alia*, required the LOF defendants to place the interests of the company ahead of any private interests in the performance of their duties. The defendant Skeddle is alleged to have represented that he always complied with LOF's Standards of Conduct. The LOF defendants also signed employment agreements agreeing not to become directors of any outside business without LOF's prior consent.

The LOF defendants, with the aid of the other defendants, are also alleged to have laundered the proceeds of the CTM, ESMO, and VDI transactions through other corporations which were created for that purpose and, as well, to conceal their activities from LOF and its tax accountants. In the course of doing so, the defendants are alleged to have committed various tax offenses (which have been severed for trial from the other charges). (Doc. 454).

The defendants filed a motion to dismiss the mail fraud counts on the basis that under Ohio law the LOF defendants were not required to disclose their self-dealing absent proof by the government that the transactions were unfair to LOF. (Doc. 118). According to the defendants' motion, which was addressed to the original indictment, no offense was stated under the mail and wire fraud statutes because the indictment "failed to identify a *single* allegedly false pretense, representation, or promise made by any defendant to LOF in furtherance of an alleged scheme to defraud" or "a *single* overt act involving an allegedly false statement made to LOF." (*Id.* at 2) (emphasis in original). In the defendants' view, "the government appears to predicate the mail fraud and wire fraud counts of the indictment solely upon defendants' alleged failure to disclose certain information to LOF." (*Id.* at 3). Thus, as the defendants presented the issue, the government could prevail only if it proved either affirmative misstatements to LOF or a viola-

tion of the LOF defendants' fiduciary duty to disclose their interest in the transactions. Because the indictment, according to the defendants' portrayal of the indictment and applicable law, did not allege affirmative misrepresentations to LOF, and, in their view, Ohio law imposed no duty of disclosure, the indictment failed to allege crimes under the mail and wire fraud statutes. (Doc. 156 at 2–3). I concluded that the indictment failed to state the source of the alleged duty to disclose, and allowed the government time in which to seek a superseding indictment. (Doc. 209).

Thereafter, I called on the parties to address the question of the burden of proof on the issue of fairness. (Doc. 276). In response to that order, the defendants argued that "the government must prove the alleged unfairness of the transactions beyond a reasonable doubt in order to convict the defendants of mail or wire fraud." (Doc. 282 at 2). In addition, the defendants filed a motion to dismiss the superseding indictment on the basis, *inter alia*, that the mail and wire fraud counts failed to state an offense. (Doc. 295).

I concluded that, if the issue of fairness relevant in this case, the burden of proof was on the defendants to prove that the transactions were fair. (Doc. 358). The defendants then filed additional motions restating their contention that Ohio law relieves them of culpability for undisclosed self-dealing by the LOF defendants absent proof by the government that the transactions were unfair. *See* Motion to Preclude Retroactive Application of the Court's Novel and Unforeseeable Construction of Ohio Law (Doc. 389); Motion for Reconsideration, etc. (Doc. 396); Motion for Bill of Particulars (Doc. 300); Memoranda re Certification (Docs. 391, 415, 416, 418, 419).

I concluded that Ohio law imposed a duty on the LOF defendants, as officers and directors of LOF, to disclose their interest in the transactions. (Doc. 431). I overruled the motion to dismiss the superseding indict-

ment (which was based, in part, on the contention that document failed to charge offenses under the mail or wire fraud statutes). (Doc. 445). Concurrently, I notified the parties that I had tentatively concluded that the issue of fairness was not relevant in this prosecution; I granted, however, leave *sua sponte* to the parties to address that issue further. (Doc. 432). Prior to oral argument on that question, I submitted additional questions to the parties for their consideration prior to that hearing and received citation lists in support of the parties' respective positions. (Doc. 474).

The defendants' arguments in their pending motions and at oral arguments on those motions and related matters has caused me to reexamine *de novo* their motion to dismiss (Doc. 295) and related motions, their briefs, the briefs and arguments by the government, and applicable case law. For the reasons that follow, I am persuaded that the indictment sufficiently alleges that the defendants: 1) engaged in a scheme and artifice to a) defraud and b) deprive LOF of its money and property by false and fraudulent pretenses and representations, and 2) deprived LOF of its right to the honest services of the defendants Skeddle, Costin, and Bryant. I conclude, as well, that the mail and wire fraud statutes are not void for vagueness. There is, therefore, no merit to the defendants' challenges to the pending mail and wire fraud charges.[2]

## I. The Defendants' Contentions

Throughout the period of my consideration of the defendants' challenges to the sufficiency of the indictment, their briefs and arguments have focused extensively on their claim that the conduct attributed to the LOF defendants in the indictment violated none of the duties owed by those defendants to LOF, absent proof by the government that the transactions were unfair to LOF. Because, in the defendants' view, no fiduciary duties [3] to

---

2. This determination does not affect my rulings concerning the insufficiency of Counts 8, 9, and 10. That ruling is the subject of pending cross motions to reconsider. (Docs.465, 468).

3. As others have noted, the meaning of the term "fiduciary" when applied to corporate officers differs from that term's meaning when applied to

persons in other positions of trust and confidence (e.g., executor of a will, trustee of a trust, guardian of an estate, etc.). *See, e.g.,* Kaplan, *Fiduciary Responsibilities in the Management of Corporations,* 31 Bus.Law. 883, 886 (1976) ("The very definition of a fiduciary is nebulous and uncertain; the meaning of the concept of fiduciary

LOF, as Ohio law[4] defines those duties, were breached, the LOF defendants did not deprive LOF of its right to the honest services of its employees or otherwise engage in a scheme or artifice to defraud LOF or deprive it of money or property. Thus, the defendants contend, the mail and wire fraud counts are insufficient on their face to charge an offense.

Section 1701.60(A)(1)(c) of the Ohio Revised Code, on which the defendants have principally based their demand for dismissal, states, to the extent applicable here, that "[n]o contract, . . . or transaction shall be void or voidable for the reason that it is . . . between or affects the corporation and any . . . person in which one or more of its directors or officers are directors, . . . or officers, or have a financial or personal interest . . . if . . . [t]he contract, . . . or transaction is fair to the corporation." According to the defendants, this provision relieved the LOF defendants of any obligation to disclose their participation in the transactions recited in the indictment. Absent a showing of unfairness, the defendants contend, the LOF defendants had no duty to disclose that involvement. Succinctly put, the defendants assert that, where there has been no harm to LOF, there can have been no breach of their fiduciary duties to the company. Thus, in their view, the government can prevail at trial on the mail and wire fraud counts only if it shows that the transactions were not fair.

For the reasons that follow, I am unpersuaded by the defendants' argument that § 1701.60(A)(1)(c) imposes a burden on the government to prove that the transactions were unfair. I also conclude, on the basis of further consideration of the parties' briefs and authorities, examination of the indictment, and review of applicable cases, that the indictment sufficiently alleges a breach of the duty to refrain from self-enrichment at LOF's expense.

The defendants have primarily focused their challenge to the mail and wire fraud counts on (and I, correspondingly, have primarily directed my attention to) their claim that, as a result of § 1701.60(A)(1)(c), the LOF defendants were not obligated to inform LOF of their interest in the transactions. As discussed below, and as made clear by cases applying the mail and wire fraud statutes, including the cases on which the defendants principally rely, nondisclosure by the LOF defendants of their involvement was unrelated to their self-enrichment at LOF's expense. Even if the LOF defendants had disclosed their interest in the transactions, such disclosure would not have relieved them of the separate, distinct, and concomitant duty to avoid such self-enrichment.[5]

### A. O.R.C. § 1701.60(A)(1)(c) is Inapplicable in This Federal Mail and Wire Fraud Prosecution

#### 1. Proof of Harm Encompasses the Issue of Fairness

I previously concluded that the government must prove that the LOF defendants breached their fiduciary duties to LOF, they intended thereby to harm LOF by obtaining LOF's property or money for themselves, and such harm was reasonably foreseeable

responsibility is likewise imprecise and unsure"). All fiduciaries owe, however, a general duty of loyalty, even though how those duties are fulfilled may vary depending on the context. In this opinion, I use the term fiduciary with reference to the duties of loyalty and care imposed by Ohio law on corporate officials. (See Doc. 432 at 6–17 and cases cited therein).

4. I agree with the defendants that the duties owed by the LOF defendants to LOF were defined by Ohio law.

5. On rereading the defendants' briefs, I perceive that their challenge to the mail and wire fraud counts is not limited to the effect of § 1701.60(A)(1)(c) on the duty, or lack thereof, of the LOF defendants to disclose ownership of companies doing business with LOF. Rather, they appear to contend that either that is the only breach of duty alleged in the indictment or the indictment is otherwise insufficient on its face under the mail and wire fraud statutes. (Docs. 119 at 4–17, 156 at 1–17, and 295 at 5–25) They have also argued that those statutes are unconstitutional. (Docs. 109 at 6–10, 118 at 17–20, and 295 at 25–32).

Because my attention has been on the issue of § 1701.60(A)(1)(c), I have not until now addressed the other aspects of the mail and wire fraud charges or the merits of the defendants' clams that the indictment, in toto, fails to state mail and wire fraud offenses or their challenge to the constitutionality of the underlying statutes.

(Docs. 209 at 9, 358 at 3).[6] By placing this burden on the government, the cases avoid the risk that a breach of fiduciary duty, without more, can result in conviction for mail or wire fraud. This result is required under *Epstein v. United States,* 174 F.2d 754, 765 (6th Cir.1949) ("receipt of [corporate dividends] by a director without disclosure of interest [in the company from which he receives such income] to the board of directors [of the company to which he owes a duty of loyalty] does not constitute perpetration of an active, intentional fraud upon his corporation where there is good faith, fair dealing, and benefit to the corporation of which he is a director)."

■ On further consideration of the parties' arguments, I conclude that a contract or transaction which has been proven beyond a reasonable doubt to have caused harm cannot also have been "fair." *Cf.* Burton & Rich, *Ohio Corporation Law and Practice* 118 (1991) ("various activities between a director or officer and his corporation ... cannot be found to meet a fairness to the corporation standard, presumably even under the current requirements of § 1701.60 ... [including] (i) the sale to the corporation of property of the director or officer for a grossly overvalued amount and (ii) the purchase by an insider of a corporation's property for such an inadequate price as to present evidence of fraud or mistake") (citations omitted). Proof beyond a reasonable doubt of tangible harm or injury to LOF nullifies any putative fairness. If the jury finds that such harm was done to LOF, the transactions cannot have been fair. On the other hand, if, as in *Epstein,* the government fails to show actual, intended, or anticipated loss and harm, or its proof is rebutted by the defendants' evidence, they will be acquitted. "Fairness," as such, is immaterial, given the burden that the government already has under the mail and wire fraud statutes to show tangible injury to LOF. Viewed in this manner, the defendants' suggestion of "no harm, no breach of fiduciary duty" means "no harm, no conviction."

### 2. *§ 1701.60(A) is Otherwise Inapplicable*

The foregoing discussion answers the defendants' argument that the government has to prove that the transaction was unfair. In any event, for reasons that I have mentioned in earlier orders, I also conclude that O.R.C. § 1701.60(A) plays no role in this case. First, because under Ohio law the burden of proof is on the director or officer who has not disclosed his or her interest in a transaction to prove its fairness, *United States v. Skeddle,* 940 F.Supp. 1146 (N.D.Ohio 1996), there necessarily is an antecedent duty of disclosure. If there were no such antecedent duty, which existed independently of the issue of fairness, there would be no need to place the burden of proving fairness on the corporate officer who secretly dealt with his or her company. The fairness of the transactions, if established, excuses the breach; it does not, however, eliminate the expectation that directors will not engage in such transactions, or, if they do so, the expectation that disclosure will occur.

I conclude, accordingly, that directors and officers have a duty under Ohio law to disclose their interest in transactions between them and their companies. (*See* Doc. 431). If the transactions were fair—i.e., caused no harm to LOF—the breach of that duty is nullified, and the defendants cannot be held accountable for nondisclosure of their self-dealing.

Alternatively, I am of the view that § 1701.60(A)(1)(c) is limited in its scope to the civil sphere: it merely enables a party, on a showing that a self-dealing transaction was fair, to enforce the contract. Prior to adoption of this provision, earlier Ohio decisions had stated that contracts between a corporation and its officers or directors were void. *See, e.g., United States Rolling Stock Co. v. Atlantic & Great Western R.R. Co.,* 34 Ohio St. 450, 460–61 (1878). To ameliorate the problems that could arise, especially if the corporation sought unilaterally to repudiate the contract, § 1701.60(A)(1)(c) allows the

---

**6.** Such harm must be more than *de minimis:* use of a few postage stamps for personal mail would not constitute economic harm under the mail and wire fraud statutes. The actual, intended, or reasonably anticipated losses and harm alleged in this case, however, hardly constitute *de minimis* injury.

contract to be upheld if the self-dealing director or officer shows it was fair. Where the company suffered no harm, there is no reason to punish the other party for the self-dealing director's noncompliance with his or her duty of disclosure to the corporation. This is especially true where the self-dealing director had no control over the decisions of the company in which he or she had an interest and which was contracting with the company entitled to the benefits of the officer's fiduciary duties. Regardless of whatever benefit, if any, the director may improperly have derived directly (i.e., by payments to him or her) or indirectly (i.e., as shareholder dividends) as a result of such interest, the other party, under § 1701.60(A)(1)(c), can enforce the contract if it was fair to the director's corporation.

Section 1701.60(A)(1)(c) also upholds the integrity of contracts and deters use of undisclosed self-dealing as a pretext for repudiation. This statute, by its own terms and in light of these considerations, protects transactions and contracts, not self-dealing directors and officers.

This case, obviously, does not involve an effort to uphold either the CTM, ESMO, or FAS contracts. That the defendants might have been able to enforce those contracts if they showed they were fair has, accordingly, no bearing on the government's proof at trial. As pointed out, the government must prove actual, intended, or anticipated injury to LOF to the satisfaction of the jury. If no such injury, or insufficient injury or harm is shown, acquittal will occur. Such acquittal will, however, be based on the lack of harm or lack of intent to harm, rather than O.R.C. § 1701.60(A)(1)(c).[7]

### B.  O.R.C. § 1701.60(A)(1)(c) Does Not Relieve Corporate Officials of Other Fiduciary Duties, Including The Duty to Refrain From Self–Enrichment

■  As noted, the purpose of § 1701.60(A)(1) was to alter the absolute rule that self-dealing transactions were void, thereby moderating the effects of that rule.

The scope of that provision is, however, no broader than that purpose:

> Even if a corporate official establishes that a transaction meets one or more of the tests set forth in § 1701.60(A)(1) [i.e., was fair to the corporation], that transaction is *not* necessarily valid by reason of that fact. The transaction can still be attacked on a variety of grounds independent of § 1701.60. For example, the transaction may be set aside or enjoined if it involves a waste or conversion of corporate assets, violates the terms of the corporation's articles or regulations, violates other provisions of Ohio or federal statutes, or is otherwise unenforceable. The primary purpose of § 1701.60 is to limit the common law rule of automatic voidability of transactions involving an interested corporate official; it is *not* designed to preclude other legal challenges to "interested transactions" simply because the corporate official is able to demonstrate compliance with one or more of the tests set forth in the statute.

Schrag, Lautzenhiser & Flahive, *Director and Officer Liability and Indemnification: The Ohio Approach,* 20 U.Tol.L.Rev. 1, 25–26 n. 79. *Accord* 3 Fletcher *Cyclopedia of the Law of Private Corporations* § 919 (1994 Rev.); ABA Section of Corporations, Banking and Business Law, Committee on Corporate Laws, *Corporate Directors Guidebook,* 33 Bus.Law. 1595, 1599 (1978).

In their many briefs and arguments in this case, the defendants appear to have treated § 1701.60(A)(1)(c) as if it provides absolute protection against the charges in the indictment. To the extent that their approach relies on the view that § 1701.60(A)(1)(c) has that expansive effect, they misperceive the statute's limited scope and disregard other aspects of corporate officers' duties to their corporation. To the extent, moreover, that the defendants view the indictment as alleging only a breach of the duty of disclosure of interest in the transaction, they misread the indictment's allegations.

---

7. In view of my conclusions concerning § 1701.60(A)(1)(c), I reconfirm my earlier ruling (Doc. 364) that there is no basis for granting the defendants' claim (Doc. 111) that the search warrant which issued for the offices of Wickens, Herzer and Panza was tainted by the government's failure to inform me that it had to prove the transactions were unfair.

Directors and officers of a corporation in Ohio historically have owed—and continue to owe—a duty to the corporation and its shareholders to refrain from profiting at the company's expense. *Taylor v. Miami Exporting Co.,* 5 Ohio 162, 166 (1831) ("those who act for the corporation and conduct its affairs, ... cannot appropriate the corporation funds to their individual advantage, to gratify their passions or serve any other purposes than those for the general interest of the corporation"). Thus, as stated in *Thomas v. Matthews,* 94 Ohio St. 32, 43, 113 N.E. 669 (1916):

> It is the settled law of this state that directors must manage the corporate business with a view solely to the common interest, and cannot directly or indirectly derive personal profit or advantage from position which is not shared by all the stockholders.... They occupy a strictly fiduciary relationship to the stockholders.

To that end, the court also stated in *Thomas,* a director cannot

> enter into any contract whatever as to his actions in his official capacity that will in any way restrict or limit the free exercise of his judgment and discretion, or place him under any direct and powerful inducement to disregard his duty to the corporation and the stockholders in the management of the corporate affairs. Such a contract is against public policy and void.

*Id.* at 60–61, 113 N.E. 669. *See also Genesis Respiratory Serv. v. Hall,* 99 Ohio App.3d 23, 29, 649 N.E.2d 1266 (1994) (director liable for misapplication of corporate funds where he "had conflicting loyalties and, in light of those conflicting loyalties, the director violated a fiduciary duty to the corporation"); *Prodan v. Hemeyer,* 80 Ohio App.3d 735, 610 N.E.2d 600 (1992) (director cannot usurp corporate opportunity for his own profit); *Wing Leasing, Inc. v. M & B Aviation, Inc.,* 44 Ohio App.3d 178, 181, 542 N.E.2d 671 (1988) ("principles which govern the fiduciary relationship between a corporation and its directors include a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure"); *Hubbard v. Pape,* 2 Ohio App.2d 326, 329–30, 203 N.E.2d 365 (1964) (usurpation of corporate opportunity);

*Michals Ent., Inc. v. Alexandrou,* 1984 WL 3617, at *2 (Ohio App.8th Dist., Cuyahoga Co., Nov. 21, 1984) ("the undivided loyalty rule ... prohibits a director or officer from placing himself in a position of conflicting loyalties and subsequently violating his primary duty to the corporation").

The duty to refrain from profiting at the expense of the corporation applies where a corporate director has an interest in both companies to a contract. *Truman v. Coghlin Mach. & Supply Co.,* 11 Ohio App. 220 (1919); *City Auto Stamping Co. v. State ex rel. Fulton,* 13 Ohio Law Abs. 67, 72 (1932) ("directors and officers can not prefer themselves or other persons or corporations in which they are interested"). In such circumstances, "the transactions are subject to scrutiny, and are sustained only if they are fair and made in good faith." *Id.* at 223. This duty applies regardless of any disclosure that may have been made concerning the relationship which gave rise to the potential for self-enrichment at the expense of one of the corporations. Thus, in *Thomas, Truman,* and *City Auto Stamping,* all participants were aware of the underlying relationships that ultimately resulted in the claim by one of the participants that the other had misused his position for personal gain, thereby causing injury to the entity to which he owed a paramount duty of loyalty.

In other words, even if the LOF defendants had revealed their interests in CTM, ESMO, VDI, and FAS, and LOF waived its corporate policies prohibiting such interests, such disclosure and wavier would not have relieved them of the obligation to avoid profiting at LOF's expense. *Epstein v. United States,* 174 F.2d 754, 768 (6th Cir.1949) ("a mere disclosure of interest could not convert an actual fraud with a wrongful purpose to injure or deceive, into an honest, moral, transaction with a purpose to benefit"). *See also United States v. Waymer,* 55 F.3d 564 (11th Cir.1995) (school board member convicted for receiving kickbacks though he had disclosed the existence of his business relationship with a supplier to a board official). Regardless of § 1701.60(A), and whether or not the LOF defendants complied with their duty to disclose potential conflicts, those de-

fendants could not "derive directly or indirectly derive personal profit or advantage from their position." *Thomas*, 94 Ohio St. at 43, 113 N.E. 669. The LOF defendants remained obligated under Ohio law to give primacy to LOF and its interests, whether their interests in CTM, ESMO, VDI, and FAS were disclosed to or hidden from the company's view.

The cases to which the defendants look for support for their claim that their alleged undisclosed self-dealing and resulting enrichment at the expense of LOF breached no duties owed by them to the company do not support that contention.[8] The primary Ohio decision which they cite in support of the argument, *Nienaber v. Katz*, 69 Ohio App. 153, 43 N.E.2d 322 (1942), states, as defendants point out, that nondisclosure of an officer's interest in a transaction, without more, does not give rise to a claim for recovery against a corporate officer. "The secrecy," the court stated, "is simply the cloak under which [the officer] has hidden his failure of duty and the personal profit he has thereby made." *Id.* at 158, 43 N.E.2d 322. Not the secrecy of the officer's participation, but his acquisition of personal profit at corporate expense entitles the company to recover: liability attaches "because of the duty of undivided loyalty" breached by "his own enrichment." *Id.* Absent self-enrichment at the corporation's expense, undisclosed participation, according to *Nienaber*, is not actionable.

The *Ohio Drill* cases likewise do not support the defendants' contention that the indictment is not sufficient. In *Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 195 (6th Cir.1974), the Sixth Circuit stated that, "the law is clear that directors who violate their duties as fiduciaries are liable for any profits resulting from such a breach." Following remand and appeal, the court held in *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980), that

When a director breaches his duty of trust and benefits at the expense of the corporation, under Ohio law the director is liable for any profits he received. It matters not that the director acted absent actual fraudulent intent; as long as the director places himself in a position of conflicting loyalties and subsequently violates his primary obligation to the corporation, liability attaches. The breach giving rise to recovery in *Ohio Drill* was unrelated to any nondisclosure about the defendants' participation on different sides of several of the challenged transactions in that case.

In *Ohio Drill* the court also determined that one of the defendants, an insurance broker, had not profited from his sales of insurance on behalf of the company. Though his participation as sales agent for the policies was not disclosed, he met his burden of proof of showing that the contracts were fair to the company. He did not profit at the company's expense (in violation of his duties to the company) because his "commissions were not excessive but rather 'standard and reasonable' and 'very fair'" and those commissions were no greater than he received when he later placed the business with another company. *Id.* at 743. His nondisclosure of his involvement was not actionable because no loss or harm was caused to the company.

In a later case, *Radol v. Thomas*, 772 F.2d 244 (6th Cir.1985), the Sixth Circuit noted the "long established principle ... that directors of a corporation have an obligation to the corporation which is in the nature of that of a fiduciary." *Id.* at 256. Referring to "the proposition established by [*Ohio Drill*] and *Seagrave v. Mount*, 212 F.2d 389, 397 (6th Cir.1954), that good faith and full disclosure to shareholders do not insulate a director from liability if he has placed himself in a position of conflicting loyalties to a corporation and his own private interest," the court held that the trial court accurately recited Ohio law when it told "the jury that a

---

**8.** I note that I have earlier called the defendants' attention to the obligations flowing from their status as corporate agents. (Doc. 431 at 8). The cases discussed herein indicate that no special finding of agency is required before self-enrichment will be held to violate the mail and wire fraud statutes. Instead, the cases focus on the obligations owed by a corporate officer or employee without preliminary consideration of the more general duty, *see generally* Restatement of Agency 2d § 13, of all agents, including a corporation's agents, to be faithful to their principal's interests, and thus, to refrain from self-enrichment at their employer's expense.

fiduciary 'must give his undivided loyalty' to the corporation and breaches his duty if he intentionally acts contrary to the best interests of the corporation." 772 F.2d at 257.

The remaining case on which the defendants rely, *Epstein v. United States*, 174 F.2d 754 (6th Cir.1949), likewise provides no support for any contention that self-enrichment at LOF's expense did not breach the LOF defendants' obligations to the company. The indictment in that case, which was similar in some of its elements to the indictment in this case, charged that the defendants, acting through a company in which they had an undisclosed interest, sold supplies at excessive prices to a company of which they were officers and directors, and that they pocketed the resulting excessive payments.[9] "This," the court stated, "was a charge of fraud with a dishonest, immoral purpose—a scheme to charge, not fair prices, but excessive prices, and to cause payment, not of fair amounts for the commodities purchased, but of excessive amounts.... It was a charge of actual, active, intentional fraud." *Id.* at 760.

The proof, however, developed differently at trial, with the government's witnesses conceding that "the sales ... were at market prices or below," so that "practically every government witness did more to prove the case for the defense than the case for the government, probably because the actual facts could not be reconciled with the government's claims." *Id.* at 761. The court in *Epstein* noted that the government, as it encountered problems with its case, sought to alter its theory of prosecution to allege a breach of duty through acquisition of secret profits, to which the defense would have been good faith. The failure of proof and mid-trial shift in the prosecution's theory led the court to hold that there was a fatal variance between the allegations in the indictment (charging excessive prices) and proof at trial (that the prices were at or below market prices). *Id.* at 763. As a result of this variance, the court of appeals stated, a judgment of acquittal should have been entered at the conclusion of the government's case.

The government argued in *Epstein* that the defendants' receipt of dividends (i.e., profits) from transactions, without more, constituted active, actionable fraud for which the defendants could be convicted under the mail fraud statute. Rejecting this contention, the court stated, "receipt of such returns by a director without disclosure of interest to the board of directors does not constitute perpetration of an active, intentional fraud on his corporation where there is good faith, fair dealing, and benefit to the corporation of which he is a director." *Id.* at 765. Instead, the court continued, it is "necessary to distinguish between an active fraud perpetrated by a director against his corporation, and a constructive fraud resulting from dealings between a director and his corporation." *Id.*

"Actual fraud," the court stated, "has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud.... A charge of using the mails to carry out a scheme to defraud cannot be maintained on proof of mere constructive fraud." *Id.* at 765–66. If the proof, the court stated in *Epstein*, showed that the transactions were advantageous to the company, because it received full value, was able to purchase at market or below, incurred no detriment, and secured better bargains from the defendants than elsewhere, a mere failure to disclose the defendants' interest in the transactions, the court stated, "did not clothe this otherwise fair course of dealing with intentional fraud, dishonest in purpose, and inconsistent with moral uprightness." *Id.* In *Epstein*, it was "agreed that the transactions would not be subject to the charge of fraud, if the directors had disclosed their interest. There was, therefore, nothing inherently dishonest or inconsistent with moral uprightness about these transactions." *Id.*[10]

---

9. As noted in *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D.Fla.1962), the court in *Epstein* did not hold that the indictment was insufficient.

10. The court's decision in *Epstein*, it should be noted, provides no support for the defendants' contention that the burden of proof on the issue of fairness is on the government. The court stated that "the defense to the charges in the indictment was that the [victims] were not charged, and did not pay excessive prices, but

The court's decision in *Epstein* does not persuade me of defendants' arguments that the indictment in this case is insufficient, § 1701.60(A) excuses all alleged breaches of fiduciary duty, or the government has the burden of proving the transactions were unfair to LOF. Unquestionably, nondisclosure of the defendants' interest in the transactions could not, without more, lead to a conviction under any aspect of the mail fraud statute. Such breach of fiduciary obligation, if unaccompanied by loss or injury to LOF, is not culpable under the honest services provision of 18 U.S.C. § 1346. *United States v. Jain*, 93 F.3d 436, 441 (8th Cir.1996); *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C.Cir.1983) ("employee's undisclosed conflict of interest does not by itself ... pose the threat of economic harm to the employer" absent "some concrete business harm"); *United States v. Ballard*, 663 F.2d 534, 540 (5th Cir.1981) ("breach of fiduciary duty can constitute an illegal fraud only when there is some detriment to the employer"). Likewise, such nondisclosure alone would not give rise to a conviction under § 1341 or § 1343, which require proof of a scheme or artifice to defraud for the purpose of causing, or which actually caused, economic harm and injury to the victim. *Jain*, 93 F.3d at 441 ("[t]he essence of a scheme to defraud is an intent to harm the victim").

## II. The Allegations in the Indictment Are Adequate Under §§ 1341, 1343 and 1346

The mail and wire fraud statutes are extensive in their scope. This results, in part, from the very general terms used by Congress in those enactments. *See United States v. Von Barta*, 635 F.2d 999, 1005 (2d Cir.1980) ("[t]he absence of legislative guidance has left the courts with broad discretion to apply the mail fraud statute to the myriad fraudulent schemes devised by unscrupulous entrepreneurs").

The expansive interpretation and application of the mail and wire fraud statutes has

also resulted from the view, as exemplified in *Fasulo v. United States*, 272 U.S. 620, 628, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926), that the phrase "scheme or artifice to defraud" is broad and "extends to a great variety of transactions," so that a "comprehensive definition of 'scheme or artifice to defraud' need not be undertaken ." Thus, "the words 'to defraud' ... have been given a wide meaning, wider than their ordinary scope." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

Any argument that the terms "scheme or artifice to defraud" are not to be construed broadly, and that they cannot apply beyond the common law definition of deceit "must fail [because] the statute is not limited to what would give rise to a civil action, .... There are numerous decisions which show that a scheme to defraud can exist under the statute without the existence of all of the elements for constituting a common-law fraud." *United States v. Groves*, 122 F.2d 87, 90 (2d Cir.1941). A "construction of the statute which is wider than the common law idea of fraud," a district court noted in *United States v. McKay*, 45 F.Supp. 1007, 1011 (E.D.Mich.1942), "is justified by the use of the alternative in the statute which refers to 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses.' "

In the Sixth Circuit

The phrase 'scheme or artifice to defraud' is to be construed bearing in mind the underlying purpose of the statute to preserve the use of the mails to legitimate ends.... What is here meant by 'to defraud'? Obviously the statute is dealing with the wrongful purpose to injure, with which the scheme or artifice must be connected. These words, in the phrase quoted, are not descriptive of the character of the artifice or scheme which has been devised, but rather of the wrongful purpose involved in devising the same, .... This

fair prices." 174 F.2d at 763. According to the court, "the burden is on the director *** not only to prove the good faith of the transaction but also to show its inherent fairness," *id.* at 764 (*quoting Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939)), and "where the fair-

ness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness" (*quoting Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921)). 174 F.2d at 764.

purpose must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out.... A scheme may include a plan or device for the legitimate accomplishment of an object. But to come within the terms of the statute under consideration the artifice or scheme must be designed to defraud.

\* \* \* \* \* \*

If the scheme or artifice in its necessary consequence is one which is calculated to injure another, to deprive him of his property wrongfully, then it is to defraud within the meaning of the statute.... While it is true that fraud generally implies artifice or deception, one may be defrauded of his property when he has been wrongfully deprived thereof. To 'deprive of something dishonestly' is to defraud. It is not uncommon to speak of one as defrauded of his rights who has been wrongfully deprived of them by other means than chicane or trickery. The reward justly due one for services may be withheld, and in that sense he is defrauded. 'To withhold wrongfully from another what is due to him is to defraud.' 'To defraud implies or includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence generally imposed, and are injurious to another, or by which an undue and unconscionable advantage is taken of another.'

*Horman v. United States,* 116 F. 350, 351–54 (6th Cir.1902).

Despite these expansive statements, the reach of the mail and wire fraud statutes is not unbounded. The Eleventh Circuit recently noted in *United States v. Brown,* 79 F.3d 1550, 1555 (11th Cir.1996), that

Language from our earlier opinions suggests that the federal fraud statutes encompass almost any situation. In *Gregory v. United States,* for example, we wrote that fraud is deviation from conduct that is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.' 253 F.2d 104, 109 (5th

Cir.1958). But, not all of the language of the judges in an opinion has the force of binding precedent. And, as the Seventh Circuit has noted, such language, 'cannot have been intended, and must not be taken, literally.' *United States v. Holzer,* 816 F.2d 304, 309 (7th Cir.1987).

"A limitless reading of the mail fraud statute," the court stated in *Brown,* "could result in a kind of federal criminal common law, that is, a situation where a person could be convicted of a crime against the United States despite the conduct not violating and express statutory provision." *Id.* at 1556–57.

■ As recited above, the indictment alleges certain misrepresentations, extensive steps to avoid detection, charging of excessive prices, use of rigged bids,[11] and affirmative disclaimers of conflicts of interest. In addition, and most fundamentally, it alleges that the LOF defendants enriched themselves by those and other means at the expense, and to the substantial injury of LOF. The indictment attributes specific acts to the other defendants in conjunction with the acts by the LOF defendants, and shows how the other defendants furthered the plans and purposes of the LOF defendants.

In light of the broad application of the mail and wire fraud statutes, several cases have upheld convictions based on indictments alleging breaches of duty and conduct similar to those asserted in this case. As noted by the Second Circuit in *United States v. Dixon,* 536 F.2d 1388, 1399 (2d Cir.1976), "there is abundant authority that a scheme to use a private fiduciary position to obtain direct pecuniary gain is within the mail fraud statute." That court had earlier held that "[i]ntentionally converting trust funds to the personal use of the trustees is a patent fraud on the cestuis from whom the funds were solicited" and "[u]sing a fiduciary position ... to obtain secret profits based upon inside information, is not only a breach of trust, but an active fraud." *United States v. Buckner,* 108 F.2d 921, 926 (2d Cir.1940). *Accord, United States v. Stout,* 499 F.Supp. 602, 604 (E.D.Pa. 1980) ("a breach of trust combined with the

---

11. In the Sixth Circuit a mail fraud indictment and conviction can be based on bid rigging.

*United States v. Ames Sintering Co.,* 927 F.2d 232 (6th Cir.1990).

specific intent to defraud is 'fraud' within the meaning of the mail fraud statute"); *United States v. Mandel*, 415 F.Supp. 997, 1010 (D.Md.1976) ("if a fiduciary has a personal conflict of interest with his duties as fiduciary to a trust, but ... acts to conceal that conflict from the trust, such actions are fraudulent if made with the intent to deceive"); *United States v. Dorfman*, 335 F.Supp. 675, 679 (S.D.N.Y.1971) ("[i]n various contexts, the breach of the trust of a fiduciary who uses his position to make secret profits has been held to be fraud within the meaning of the wire and mail fraud statutes"); *United States v. Faser*, 303 F.Supp. 380, 383 (E.D.La.1969) ("[i]t is settled beyond question that an agent who makes a profit from his business conducted by him on account of his principal has a duty to the principal to account for such profit"); *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D.Fla.1962) ("[u]sing a fiduciary position to obtain secret profits is not only a breach of trust but an active fraud, and such conduct is condemned by the mail fraud").[12]

There are many instances in which self-enrichment at a corporation's expense have led to mail fraud convictions. Thus, in *United States v. Lichota*, 351 F.2d 81 (6th Cir. 1965), the defendants were an attorney for an agricultural cooperative, who, with the assistance of his wife (also a lawyer), engaged in undisclosed self-dealing with his employer. The defendant represented that he could get a better price for printing services from his company. His firm, however, overstated the quantities delivered and charged prices substantially higher than its cost for obtaining the materials from its supplier. Upholding the defendants' convictions, the Sixth Circuit rejected their contention that they acted in good faith and their prices were less than could have been obtained from other suppliers. In response to the defendants' assertion that any fraud on their part had merely been constructive, the court stated:

> Deception is not necessarily confined to a direct statement of fact. Not words alone but their arrangement, and the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive, even though the words themselves fall short of this. Sometimes circumstances are more eloquent than words and they impart their meaning to the words used.

351 F.2d 81, 91 (6th Cir.1965) (*quoting Linden v. United States*, 254 F.2d 560, 568 (4th Cir.1958)).[13]

**12.** In *United States v. George*, 477 F.2d 508, 512 (7th Cir.1973), the Seventh Circuit, noting the government's citation of *Faser* and *Hoffa*, stated that "[w]e need not accept the Government's far-ranging argument that anytime an agent secretly profits from his agency he has committed criminal fraud. Not every breach of every fiduciary duty works a criminal fraud." In this case, the LOF defendants were more than mere agents of LOF. They were the company's top officers, in whom the company placed, and was entitled to place, a heightened measure of trust and confidence. *Cf. United States v. Von Barta*, 635 F.2d 999, 1005 (2d Cir.1980) (defendant enjoyed a relationship with his victim that "was special in several respects" in which "he occupied a position of great trust and considerable power.... These special circumstances are the source of [his] duty of disclosure.") In any event, the indictment in this case alleges more than simply a breach of an agent's duty to refrain from self-enrichment at the company's expense: it alleges specific acts in furtherance of a scheme to deceive the company and thereby enable the LOF defendants to obtain LOF's funds for their own use and benefit.

**13.** *Accord, e.g., Henderson v. United States*, 202 F.2d 400, 404 (6th Cir.1953) ("[a] scheme to defraud, within the meaning of the statute, may exist although no misrepresentation of fact was made"). *See also Cacy v. United States*, 298 F.2d 227, 229 (9th Cir.1961) ("[d]eceitful concealment of material facts is not constructive fraud but actual fraud"); *Silverman v. United States*, 213 F.2d 405, 407 (5th Cir.1954) ("it is well settled that, if a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact makes no difference. It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension"); *Shushan v. United States*, 117 F.2d 110, 115 (5th Cir.1941) ("[t]here may be a scheme to defraud by other means than express false representation. A scheme to get money unfairly by obtaining and then betraying the confidence of another, ..., would be a scheme to defraud though no lies were told"); *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D.Fla.1962) ("[a] scheme to obtain money unfairly by obtaining and then betraying the confidence of another is a scheme to defraud although no lies are told [and] ·a scheme and artifice to defraud, ... may exist even though no misrepresentations, in fact, were made"); *United States v. McKay*, 45 F.Supp. 1007, 1011

In *United States v. Bush*, 522 F.2d 641, 646 (7th Cir.1975), the defendant, who was press secretary to the mayor of Chicago, had caused a city advertising contract to be placed with his advertising firm without revealing his interest in the firm. He argued against application of the mail fraud statute to his self-dealing, as do the defendants here, on the basis that "no judicial authority has ever gone this far in extending the mail fraud statute." Although the Seventh Circuit agreed that the defendant's conduct "was not the typical scenario found in a mail fraud case," it concluded that the defendant "engaged in a scheme to defraud the mayor and citizens of Chicago ... [with] a specific intent to engage in the fraud." *Id.*

The court found in *Bush* that the defendant, in addition to not disclosing his interest in the contract, had concealed the fact that he would be profiting thereby. Moreover, the defendant, like the LOF defendants here, had been required to file annual disclosure statements with the mayor's office. In those statements, he had falsely stated that he had no conflicting interests. The defendant's "course of conduct," the court stated, "contained active steps to deceive [including his] misrepresentations, his failure to disclose his interest in [his company], his falsification of his statements of economic interest ..., his use of multiple nominees, conduits for payments, and a numbered trust account to hide his ownership." *Id.* In view of this evidence, the court held that "his failure to provide honest and faithful services ... combined with his material misrepresentations ... and his active concealment ... [constituted] an illegal fraud ... which is cognizable under § 1341." *Id.* at 648.

In *Bush*, the defendant argued that he could not be convicted of mail fraud because the contract had been the best that could have been obtained. He pointed out that the city had continued to work with his firm even after he had been dismissed after discovery of his self-dealing. The court rejected the defendant's claim of a lack of harm to the city:

> The information that [he] owned [his company] and would receive profits as a result of [the] city's contract was information material to those city officials who were to evaluate and recommend a proposed contract and to those in the City Council who were to award a contract. That information was material as to whether to award the contract ... and, if so, at what price.... Assuming that the city would have been willing to do business with a company owned by [the defendant], the fact that [he] would be receiving profits as a result of the contract was material to the question of what percentage of [those] profits should be turned over to the city.

> \* \* \* \* \* \*

> Much was said at trial about the fact that the city did not lose money on the contract and that it was one of the best in the country. However, that argument is not convincing. First of all, if the city had known of [defendant's] interest it might have been able to obtain a better contract. Secondly, the mail fraud statute seeks to prohibit fraudulent conduct regardless of ultimate loss or damage to the victims of the crime.... If the citizens of Chicago and other public officials had known of [his] interest they could have rightfully negotiated an advertising contract which might have earned those profits for the city. The net result was that [the defendant], through his scheme, made a deal with the city by which the city profited. The deal may have been a good one for the city; the problem is that [he] deprived the city and its officials of making a better

(E.D.Mich.1942) ("[t]o establish a scheme to defraud within the scope of the statute it is not necessary that there should be an actual misrepresentation of an existing fact or that the elements necessary to constitute the common-law action of deceit exist").

Similarly, an affirmative representation can be deceptive, and be the basis for a mail fraud conviction, where it encompasses an affirmative implication, which, in turn, is deceptive. *See*

*United States v. Groves*, 122 F.2d 87, 90 (2d Cir.1941). It has also been held that intent to defraud can be evidenced by non-action on the defendant's part. *United States v. O'Malley*, 707 F.2d 1240, 1247 (11th Cir.1983) ("[f]raud, for purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent misrepresentation") (dictum).

deal, of the best deal possible, in order that he might share in the profits.

*Id.* 647–48. Because the defendant in *Bush* used his "official position within the mayor's inner circle to exert substantial influence which he had on those who were responsible for negotiating the contract ... without advising them that he was vitally interested in the contract or that his sole responsibility under the terms of the contract was to promote it," the court sustained his conviction for mail fraud. *Id.* at 647.

In another case involving self-enrichment at an employer's expense, *United States v. George*, 477 F.2d 508, 513 (7th Cir.1973), the defendant was a purchasing agent who arranged to receive kickbacks from a supplier. Upholding his conviction, the court stated that the defendant's

> duty was to negotiate the best price possible for [his employer] or at least to apprise [it] that [the supplier] was willing to sell his cabinets for substantially less money. Not only did [the defendant] secretly profit from his agency, but also he deprived [his employer] of material knowledge that [the supplier] would accept less profits. There is a very real and tangible harm to [the employer] in losing the discount or losing the opportunity to bargain with a most relevant fact before it. As Judge Learned Hand stated in a related context:
>
> > 'A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.... [H]e has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.' *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir.1932).
>
> Here the fraud consisted in [the defendant's] holding himself out to be a loyal employee, acting in [the employer's] best interest, but actually not giving his honest and faithful services, to [its] real detriment.

In light of these considerations, the court held that a fraud "within the reach of the mail fraud statute" was committed, if the government proved "that the defendants contemplated that [the employer would] suffer the loss of [the agent's] honest and loyal services" either by the agent's "secretly profiting from his agency and concealing knowledge of the availability of that material sum from [his employer], or to the further extent of his meriting the payments which he received." *Id.* at 513.

With regard to the purchasing agent in *George*, "his undisclosed receipt of kickbacks by itself warrants a finding that he intended to defraud [his employer] of his honest and loyal services. His employment duty was to negotiate the best possible deal for [it], or at least to apprise [it] that [the supplier] would be satisfied with a lesser profit margin. He is presumed to know that he could not personally profit by any decrease in price he could negotiate with [the supplier]." *Id.* at 513–14. Noting that it would be "preposterous to claim that [the employer] would have spurned such a discount if offered," *id.* at 513, the court asked, "[w]hy would the transaction be so shrouded in secrecy and spuriousness if [the agent] could legitimately make and hide from [the employer] an enormous profit from his employment position ...?" *Id.* at 514.

The decision in *George* was the basis for upholding the defendant's conviction in *United States v. Barrett*, 505 F.2d 1091 (7th Cir. 1974). In that case a county official responsible for purchasing voting machines negotiated for and received kickbacks, which were funded in part by an increase in the price paid for the machines by the county. After comparing *George* to the facts before it, the court stated

> [I]n both cases the person saddled with the responsibility for devoting loyal service to his employer concealed his secret profit from his employer and denied to that employer the right to know that the supplier of the product or service was willing to continue the supply at a discount to which the employer was entitled.

*Id.* at 1104.

In *United States v. Bryza*, 522 F.2d 414 (7th Cir.1975), the defendant likewise was a purchasing agent who took kickbacks from suppliers. He was required to, and had annually signed a disclaimer of any conflicts.

He claimed that he had not violated the mail fraud statute because his employer suffered no harm and he had had no intent to defraud. *Id.* at 420–21.

The court affirmed defendant's conviction on an honest services rationale. "The actual deception that is practiced," the court stated, "is the continued representation of the employee to the employer that he is honest and loyal to the employer's interests." *Id.* at 421 (*quoting United States v. Procter & Gamble Co.,* 47 F.Supp. 676, 678 (D.Mass.1942)).[14] The decision in *George,* the court stated,

> recognized that either the deprivation of honest and faithful services occasioned by the acceptance of secret profits or fraudulent activities to the actual detriment of the employer sufficed under the statute. In this case [the defendant's] failure to disclose his receipt of kickbacks and consulting fees from [the company's] suppliers resulted in breach of his fiduciary duties depriving his employer of his loyal and honest services. [His] specific intent is manifested by the actions he took in preventing his employer and others from discovering this breach of his fiduciary duty. The defendant assumed a bogus name, ..., formed a phony company, and lied on his annual company statement that he had no conflict of interest. Whether or not [the defendant] had a specific criminal intent to defraud is clearly demonstrated by these overt acts to defraud.... [The employer] was deprived of [the defendant's] honest and faithful services in addition to the right to make the best possible purchases. Although [the defendant] argues he obtained the best possible contracts for his employer, [it] was entitled to negotiate those purchases with the knowledge of its employee's interest.... [Although] the supplier's prices to [the employer] were fair and reasonable ..., [the defendant's] conduct nonetheless falls within the purview of the mail fraud statute. The fraud consisted in [the defendant's] holding himself out to be a loyal employee, acting in [the employer's] best interests, but actually not giving his honest and faith services, to [the employer's] real detriment.

> We believe that the evidence established that [the employee's] course of conduct amounted to an actual, rather than a constructive, fraud. By his own nefarious activities, the solicitations, the setting up of [his shell company], the use of the alias ..., the deceitful conflict of interest statements, [he] was able to defraud [his employer] of his loyal and faithful services. In our opinion, his actions clearly show a specific intent and fall within the prohibition of the mail fraud statute.

522 F.2d at 422–23.

In *United States v. Keane,* 522 F.2d 534, 545 (7th Cir.1975), a Chicago alderman, using secret information obtained in his official capacity, profited by purchasing at tax sales properties which were located in an area to be developed for public housing. Use of such information by a public official, the court stated, "amounts to a breach of fiduciary duty which is clearly actionable under the mail fraud statute." In addition, participating as a member of city council in decisions relating to such properties without disclosing his interest in those properties to the public and council was a breach of public trust which could be prosecuted as mail fraud. *Id.* at 546.

Substantially equivalent conduct is attributed to the LOF defendants as was alleged against the defendants in *Lichota, Bush, George, Bryza,* and *Keane:* namely, self-enrichment in violation of the obligation imposed on every employee not to profit at his or her employer's expense. The indictment in this case, like the indictment in those cases, alleges that the LOF defendants "breached their fiduciary duties to LOF as imposed by Ohio law and LOF's standards of business conduct, including their duties of disclosure."[15] The indictment also asserts

---

**14.** In *Procter & Gamble* the court also stated, "[t]he employee, in using the employment relationship for the express purpose of carrying out a scheme to obtain his employer's confidential information and other property, ..., would be guilty of deliberately producing a false impression on his employer in order to cheat him." 47 F.Supp. at 678.

**15.** "The word 'includes' is usually a term of enlargement, and not of limitation. As stated in *Federal Land Bank of St. Paul v. Bismarck Lum-*

that such self-enrichment was accomplished by affirmative misrepresentations, both about individual transactions and the LOF defendants' compliance with company conflict of interest policies, all accompanied by acts to conceal the self-enrichment from disclosure and discovery.

Thus, to the extent that the defendants, in their manifold arguments about O.R.C. § 1701.60(A), have also contended that the indictment also fails otherwise to state offenses under the mail and wire fraud statutes, they err. Even if that section protects them from the consequences of failing to inform LOF about their interest in CTM, ESMO, VDI, and FAS, it reaches no further, and does not protect them against allegations of self-enrichment by deceptive means and resulting harm and injury to LOF.

## C. The Mail and Wire Fraud Statutes Are Constitutional

I have previously addressed the defendants' contention that the mail and wire fraud statutes are void for vagueness. (Doc. 209 at 16–21). In the course of reviewing the defendants' motion to dismiss, I have reconsidered my earlier rejection of that argument; I find, however, no basis on which to alter my conclusion that the defendants' contention that the mail and wire fraud statutes are unconstitutional are without merit. In addition to the cases cited in my earlier decision, I note that void-for-vagueness challenges were also rejected in *United States v. Bohonus*, 628 F.2d 1167 (9th Cir.1980), and *United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir.1982) ("Section 1341 has withstood repeated challenges which have raised the claim that it does not provide fair notice and warning of the conduct proscribed by the statute"). *But see* Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 Harv.J. on Legis. 153 (1994) ("honest services" provision is unconstitutionally vague).

*Conclusion*

In light of the foregoing, I conclude that the indictment in this case sufficiently charges offenses under the mail and wire fraud statutes. The government has the burden of showing actual harm (with regard to the CTM, ESMO, and VDI transactions) and an intent to harm, or to cause reasonably foreseeable harm, with regard to the FAS transaction under each aspect of those statutes; that burden subsumes any burden that the defendants seek to impose on the government to prove the unfairness of the transactions.

In any event, the indictment alleges a substantial breach of the fundamental duty to refrain from self-enrichment, which was accomplished by fraudulent, false, and deceptive means.

There being nothing insufficient about the presently pending mail and wire fraud charges, it is

**ORDERED THAT** the challenges of the defendants (Docs.282, 295, 306, 389, 396, 433, 434, 437) to the mail and wire fraud charges presently pending against them in the superseding indictment be, and the same hereby are, overruled.

**So ordered.**

ber Co., 314 U.S. 95, 100, 62 S.Ct. 1, 4, 86 L.Ed. 65, " 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *United States v. Gertz*, 249 F.2d 662, 666 (9th Cir.1957). Ac-

cord, e.g., *United States v. Goines*, 988 F.2d 750, 773 (7th Cir.1993) ("Here, the indictment says 'including.' By its terms, this indictment is not limiting").